**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| IN RE MEREDITH CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) | Civil Action No. 19-cv-00294 (CRW)(SBJ)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

# AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Pages**


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 8

A. Lead Plaintiff ..... 8

B. Defendants ..... 8

IV. DEFENDANTS' FRAUDULENT SCHEME ..... 10

A. Meredith Acquired Time for $2.8 Billion and Combined Two of the Nation's Largest Publishing Companies ..... 10

B. Meredith Had Undisclosed Material Weaknesses in Its Internal Controls Over Financial Reporting Tied to the Value of the Time Assets ..... 12

C. Meredith Hid from Investors the Failed Time Integration, the Extent of Low-Margin Subscriptions, and the High Costs to Remedy Them ..... 25

1. Meredith Misled Investors About the Purported Success of the Time Integration ..... 26

2. Meredith Knew Throughout the Class Period, and Hid from Investors, That It Failed to Integrate Time's Finance and IT Functions ..... 29

3. Meredith Knew of the Consistent Threat from Costly Low-Margin Subscriptions in the Legacy Time Properties Throughout the Class Period ..... 38

V. THE TRUTH EMERGES ..... 51

VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..... 59

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 73

A. Defendants' False Statements and Omissions Concerning the Adequacy of Meredith's Internal Controls Over Financial Reporting ..... 73

B. Defendants' False Statements and Omissions Concerning Meredith's Purported Plan to "Hit the Ground Running" with Its Integration of Time,

the Status of Its Integration of Time, and Reduction of Low-Margin Subscriptions .......... 76

1. Defendants' Statements on Meredith's January 31, 2018 Investor Call Announcing the Completion of the Time Acquisition .......... 76

2. Defendants' February 8, 2018 and May 15, 2018 Statements Regarding the Cost of Integrating Time .......... 77

3. Defendants' March 21, 2018 Statements Relating to the Status of the Integration of Legacy Time Brands .......... 78

4. Defendants' May 10, 2018 Statements Reporting on Fiscal Third Quarter 2018 Results .......... 79

5. Defendants' August 10, 2018 Statements Reporting on Fiscal Fourth Quarter and Full Year 2018 Results .......... 82

6. Defendants' November 7, 2018 Statements Reporting on Fiscal First Quarter 2019 Results .......... 85

7. Defendants' February 11, 2019 Statements Reporting on Fiscal Second Quarter 2019 Results .......... 87

8. Defendants' May 10, 2019 Statements Reporting on Fiscal Third Quarter 2019 Results .......... 89

9. Defendants' Statements Concerning the Time Integration in Meredith's June 10, 2019 Press Release Announcing Defendant Werther's Departure from the Company .......... 91

10. Defendants' August 28, 2019 Statements Reporting Fiscal Year 2019 Results .......... 93

C. Defendants' False and Misleading Statements and Omissions Concerning Meredith's Claimed Synergies from the Time Acquisition and Its Ability to Earn $1 Billion in EBITDA .......... 94

VIII. LOSS CAUSATION .......... 111

IX. APPLICATION OF PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET .......... 112

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .......... 113

XI. CLASS ACTION ALLEGATIONS .......... 114

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......... 115

XIII. PRAYER FOR RELIEF .......... 119

XIV. JURY DEMAND .......... 119

Court-appointed Lead Plaintiff City of Plantation Police Officers Retirement Fund ("Lead Plaintiff" or "Plantation Police") brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other similarly situated purchasers of the common stock of Meredith Corporation ("Meredith" or the "Company") from January 31, 2018 through September 30, 2019 (the "Class Period").

## I. INTRODUCTION

1. Meredith Corporation is a media conglomerate that owns television stations, magazines, and websites. This case arises out of Meredith's undisclosed material weaknesses in its internal controls over financial reporting, and the financially costly failures that Meredith experienced, and hid from investors, as it purchased and tried to integrate Time, Inc. ("Time"), the former publisher of magazines such as *TIME*, *People*, *Sports Illustrated*, *Fortune* and *Entertainment Weekly*,[1] into Meredith's business.

2. Meredith and its executives had, for years, publicly declared their strong desire to acquire Time and attempted to purchase parts of the publisher on two prior occasions, in 2013 and early 2017, but failed to do so. Then, in late 2017, Meredith secured $650 million in financial backing from the private equity arm of Koch Industries, Koch Equity Development ("KED"), that allowed Meredith to acquire Time for $2.8 billion. The merger turned Meredith into the nation's largest magazine publisher. It also dramatically increased the Meredith senior executives' compensation, which included a sharp salary increase, and a one-time grant of 220,500 Meredith stock options to Defendants Stephen Lacy (Meredith's former Chief Executive Officer ("CEO")),

[1] In this Amended Complaint, unless included in a direct quote, the parent company Time, Inc. that Meredith acquired is referred to as "Time," and the eponymous magazine it published is referred to as "*TIME*."

Thomas Harty (former Chief Operating Officer ("COO") and current CEO) and Joseph Ceryanec (former Chief Financial Officer ("CFO")) – a 170.3% increase in the number of options awarded to them.

3. To justify to investors Meredith's $2.8 billion price and continued rationale for the acquisition, the Executive Defendants Lacy, Harty, Ceryanec and Jonathan B. Werther ("Werther," the former President of Meredith's National Media Group, which comprises Meredith's print magazine operations) repeatedly stated that Meredith's acquisition of Time would generate up to $550 million in synergies by fiscal 2020, and result in Meredith generating $1 billion in EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) in fiscal 2020.[2] Meredith also estimated the total cost to integrate Time into its business at approximately $300 million. Yet, as Meredith would belatedly disclose toward the end of the Class Period, the Company had material weaknesses in its internal controls rendering it unable to accurately value the Time assets, leaving Defendants without any reasonable basis to make the assumptions underlying the synergy targets and the $1 billion EBITDA projection. Defendants' lack of reasonable basis is even clearer in light of the fact they knew no later than the fall of 2018 that Meredith would need to retain a significant and costly cohort of legacy Time employees longer than originally planned because the integration was failing, and several business lines were running parallel systems that required the legacy Time employees' expertise in order to function.

4. Meredith and its senior executives repeatedly claimed during the Class Period that: (a) Meredith had adequate internal controls over its financial reporting to assess the value of the

[2] Meredith's fiscal year runs from July 1 through June 30. Therefore, the first quarter of Meredith's fiscal year runs from July 1 through September 30, the second quarter runs from October 1 through December 31, the third quarter runs from January 1 through March 31, and the fourth quarter runs from April 1 through June 30.

Time properties; (b) Meredith had a plan to "hit the ground running" after the acquisition and integrate Time into its business; and (c) as part of the integration, Meredith had implemented its "proven strategies, standards and discipline" across the legacy Time portfolio, the integration was proceeding well, and Meredith was on track to achieve its claimed $550 million in synergies and $1 billion in EBITDA. Defendants' numerous statements touting the progress of the integration included Ceryanec's November 7, 2018 statement that "our work to integrate Time Inc. is meeting our expectations," Harty's February 11, 2019 statement that "the Time portfolio and the Meredith portfolio [are] both kind of in line with . . . historical Meredith trends . . . a real significant improvement [] on the Time portfolio, especially," and Harty's June 10, 2019 statement that "[we] have made excellent progress on synergy achievement." Meredith further claimed that, by February 2019, long after the acquisition closed, the Company had "fully integrated our HR, finance, legal and IT functions" with Time's.

5. The truth was far different. As multiple former Time and Meredith employees described,[3] Defendants hid from investors that Meredith's internal controls for financial reporting were deficient and incapable of establishing the fair value of the assets and liabilities that Meredith had acquired from Time. As a result of the material weaknesses in Meredith's internal controls, Meredith was unable to value Time's assets, and experienced significant problems integrating Time's audit and accounting functions. During the Class Period, Meredith kept several sets of books on disparate financial platforms and lacked adequate finance and audit staff. Additionally, Meredith realized mere months into the integration that it could not bring Time's opeartions into

[3] Former Employees of Time and Meredith ("FEs") are described below and identified in this Amended Complaint by number (FE 1, FE 2, etc.). For ease of comprehension and readability, the Amended Complaint uses the pronoun "he" and possessive "his" in connection with the FEs. However, this convention is not meant to identify the actual gender of any of the FEs.

its ERP[4] system, so Defendants decided to run the platforms in parallel. Indeed, Meredith ran parallel systems for the finance and IT systems until August 2019. The integration was proceeding so poorly that Meredith's Integration Steering Committee (the "Steering Committee"),[5] comprised of Defendant Ceryanec and other high-ranking decision makers, including the Meredith Controller, maintained an integration plan that did not show finance and IT functions on schedule to be integrated by February 2019, but instead much later.

6. In fact, Meredith's integration of Time was a disaster, and it generated tens of millions of dollars of previously-undisclosed, additional expenses for Meredith. Time was nearly three times Meredith's size, and Meredith could not simultaneously integrate the Time properties into its own business, while trying to generate $550 million in cost synergies by laying off scores of Time employees with critical inside knowledge of the workings of Time and its finances. Integrating Time's assets, upgrading Meredith's accounting infrastructure and elevating advertising revenue from the print and digital performance of Time's assets would require significant additional, undisclosed investment spending.

7. As Meredith also hid from investors during the Class Period, it needed to make significant investments to increase the margins on low-margin magazine subscriptions that it acquired with the legacy Time brands. Low-margin (or "agency") subscriptions are subscriptions that publishers (like Time or Meredith) sell to consumers through third-party agencies in order to

---

[4] An ERP (or Enterprise Resource Planning) system is a centralized system that provides integration with all major enterprise functions be it Human Resources, planning, procurement, sales, customer relations, finance or analytics, as well to other connected application functions.

[5] Steering Committee members included: Ceryanec (CFO); Karen Johnson (VP & Assistant Controller); Tom Kutsch (Payroll Director); Chuck Howell (SVP of Strategic Sourcing, Production, and Newsstand Operations); Chris Susil (VP of Financial Planning & Analysis); Mike Lacy (Chief Information Officer); and Claire Lazo (Manager at Deloitte M&A Practice (Detroit-based)).

boost the publishers' claimed circulation numbers. A well-known sales agent is Publishers Clearing House. As part of these arrangements, a publisher and an agency agree ahead of time that the publisher will sell to the agency a set number of magazines at a pre-set "remit" rate, which is a price that is lower than the magazine's cover price at which the agent is permitted to sell subscriptions. The agency's sales to consumers increase the publisher's circulation totals, and the agency earns a profit from the margin between the remit rate and the prices paid by consumers. Although the publisher earns a lower margin per magazine from the agency subscriptions, these arrangements allow publishers to meet their claimed circulation totals, which they provide to advertisers to justify the magazines' advertising rates.

8. Throughout the Class Period, Meredith and the Executive Defendants knew that Time had relied on a significant number of low-margin subscriptions because these subscription figures were precisely calculated by Time and accurately audited by a third-party auditing company. But Meredith hid from investors the true cost to Meredith of these subscriptions.

9. Only after the Public Company Accounting Oversight Board ("PCAOB")[6] informed Meredith's outside auditor, KPMG, that Meredith had material weaknesses in its internal controls over financial reporting did Meredith reveal those deficiencies to investors on April 4, 2019. However, Meredith simultaneously minimized the impact of that disclosure by stating that Meredith would not need to restate its financials. Meredith also did not immediately reduce its projection of more than $500 million in synergies from the Time acquisition or modify their timing.

[6] Through the Sarbanes-Oxley Act of 2002, Congress created the PCAOB, a non-profit corporation that oversees the audits of public companies and SEC-registered brokers and dealers in order to protect investors and further the public interest in the preparation of informative, accurate, and independent audit reports.

10. However, on May 10, 2019, Meredith admitted that it would take longer than originally anticipated to achieve the claimed synergies from the Time acquisition due to problems with the Time integration and weaknesses in Meredith's financial controls. Because Meredith had no ability to accurately measure Time's assets on its own and ran two separate, un-integrated systems of financial reporting—one system for Meredith's legacy lines of business and a different system for Time's lines of business—the Company was forced to retain Time's financial personnel to understand Time's assets.

11. In a Form 8-K filed with the SEC on May 10, 2019, Meredith quoted Defendant Harty as stating: "[W]e believe it will take longer than originally anticipated to achieve the remainder of the synergies due to investment spending to grow the business; retaining certain employees longer than anticipated to ensure business continuity; and operating the Assets Held for Sale longer than expected." In response to this disclosure, on May 10, 2019, the price of Meredith stock declined by a statistically significant amount of $4.50, or ***7.5%***, from an opening price that day of $60.30 to a closing price of $55.80.

12. That same day (May 10, 2019), however, Defendants reassured investors by declaring victory in their efforts to integrate Time into Meredith. Defendant Werther, the former President of the Meredith division responsible for national magazines, proclaimed, "We said we would improve the print advertising performance of the acquired Time Inc. properties and we did." He added that Meredith "implemented Meredith's sales and operating strategies, standards and disciplines across the portfolio" and had already "invested in sales and marketing resources and activities." Werther further said that, "the improvement we delivered in our fiscal third quarter was driven primarily by the acquired Time Inc. brands" and "we anticipate further improvement driven again by many of the acquired brands."

13. These and other statements set forth below were materially false and misleading. On September 5, 2019, Meredith shocked the market by disclosing that it was taking a $94 million restructuring and impairment charge for fiscal 2019 related to the Time acquisition. The Company also disclosed that the Time integration had "taken longer than we initially expected" and that the Company's "comparable advertising performance lagged Meredith's expectations." Rather than generating $1 billion in EBITDA in fiscal 2020, Meredith revealed to investors that it would only generate closer to $660 million.

14. During Meredith's September 5, 2019 investor call, Defendant Harty attributed these surprising financial revelations to issues with the legacy Time brands. Harty revealed, "It took longer than expected to turn around advertising performance with the legacy Time Inc. brands," and "the number of low-margin magazine subscriptions we encountered in the legacy Time Inc. brands were more than anticipated."

15. These disclosures surprised investors and confounded analysts. Analysts at Wolfe Research said that approximately $400 million in earnings that the Company had been expecting "just…poof! disappeared," as quoted in a *Bloomberg* article. Similarly, a Benchmark analyst wrote that there was "lingering confusion over how a $1 billion initial EBITDA guide ended up at $600 million in FY20."

16. As a result of these revelations, with the financial costs of Meredith's material weaknesses in internal controls and Meredith's difficulties integrating the Time assets in clearer view, Meredith's stock price plunged over 23% during trading on September 5, 2019, closing at $33.68 per share following the previous day's close of $43.82. The September 5, 2019 drop was Meredith's largest one-day price decline since 1986.

17. Then, just weeks later, on October 1, 2019, as further evidence of the Company's accounting and internal audit weaknesses, Meredith announced, during market hours, the premature departure of the Company's CFO, Defendant Ceryanec, and, in response, Meredith's stock price fell 5.6% the next day, dropping from $36.76 per share at the market's close on October 1, 2019 to $34.73 per share at the close of trading on October 2, 2019.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered in this District and conducts business in this District, and the alleged misconduct occurred in and emanated from this District.

20. In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

21. Lead Plaintiff Plantation Police is a pension fund established for the benefit of the current and former police officers of the city of Plantation, Florida and manages over $150 million in assets for its beneficiaries. Plantation Police purchased Meredith common stock during the Class Period and suffered damages as a result of the violations of the securities laws alleged in this Amended Complaint.

### B. Defendants

22. Defendant Meredith, headquartered in Des Moines, Iowa, is a media conglomerate that owns magazines, television stations, and websites.

23. Defendant Stephen M. Lacy became Meredith's CEO on July 1, 2006, served as Meredith's Chairman of the Board beginning in late 2009, and became Meredith's Executive Chairman on February 1, 2018. Lacy stepped down as Executive Chairman as of March 31, 2019 but continues to serve as Non-Executive Chairman.

24. Defendant Thomas H. Harty became Meredith's COO on August 11, 2016 and became Meredith's President and CEO effective February 1, 2018. Harty previously served as President of Meredith's National Media Group, beginning in 2010. He subsequently resumed this role alongside his CEO responsibilities in June 2019.

25. Defendant Joseph H. Ceryanec became Meredith's CFO on October 20, 2008 and served in that role throughout the Class Period. On October 1, 2019, Meredith announced that Ceryanec would be retiring in early 2020 but had agreed to stay on in his current role until Meredith found a replacement for him. As of March 9, 2020, Ceryanec remained with the Company, though he is scheduled to depart on March 31, 2020.[7]

26. Defendant Jonathan B. Werther became President of the National Media Group at Meredith, which oversees Meredith's print magazine operations, in 2016. Werther joined Meredith in 2012 as the chief strategy officer and later became the president for Meredith Digital in 2013. On June 10, 2019, Meredith announced Werther was departing the Company effective immediately.

[7] On February 27, 2020, Meredith announced that Jason Frierott would replace Ceryanec as CFO effective as of March 9, 2020. Frierott joins Meredith after spending 21 years at General Electric, including a decade of service as CFO for multiple GE business units.

27. The Defendants referenced in ¶¶23–26 above are referred to herein as the "Executive Defendants." The Company and the Executive Defendants are referred to collectively herein as "Defendants."

28. The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's quarterly and annual reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors. The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Executive Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations being made were then materially false and misleading. The Executive Defendants are liable for the materially false and misleading statements pleaded herein.

29. Defendants are liable for: (i) making materially false statements; and (ii) failing to disclose material adverse facts known to them about the Company. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Meredith common stock: (i) deceived the investing public regarding Meredith's business; (ii) artificially inflated the price of Meredith securities; and (iii) caused Lead Plaintiff and the other members of the Class to purchase Meredith common stock at artificially inflated prices and suffer damages when the truth became known.

## IV. DEFENDANTS' FRAUDULENT SCHEME

### A. Meredith Acquired Time for $2.8 Billion and Combined Two of the Nation's

**Largest Publishing Companies**

30. On Sunday, November 26, 2017, Meredith filed a Form 8-K with the SEC, formally announcing its Agreement and Plan of Merger with Time. Time owned more than 100 well-known magazine brands, including *TIME*, *Sports Illustrated*, *Fortune*, *People*, *Money*, *Southern Living*, *InStyle*, *Real Simple*, *Travel + Leisure*, and *Entertainment Weekly*, as well as many websites and digital-only publications. Meredith viewed Time as its chief competitor, and had tried unsuccessfully to acquire Time (or parts of it) on at least two prior occasions – once in 2013, which led to stalled negotiations, and again in early 2017, when Meredith failed to obtain adequate financing.[8]

31. On November 27, 2017, Meredith held a call with investors to announce the acquisition, with Defendant Lacy heralding it as "truly a transformative moment for the Meredith Corporation," and announcing that "we're creating a premier media and marketing company with an unparalleled portfolio of national media brands."

32. During the November 27, 2017 call, Lacy's stated rationale for the acquisition of Time focused heavily on the Time properties' ability to generate "significant and consistent cash flow" and "significant revenue, EBITDA, and total shareholder return," as well as "$400 million to $500 million in synergies."

33. Then, throughout the Class Period, including on August 10, 2018, Defendants claimed that the Company was "<u>very pleased with the progress being made on integrating the</u>

[8] Meredith was only able to consummate its acquisition of Time through a combination of an all cash tender offer for $18.50 per share to each Time stockholder and additional outside financial assistance from Koch Equity Development LLC ("KED"). KED is a subsidiary of Koch Industries, one of the largest privately held businesses in the United States. As part of the acquisition, KED committed to purchase 650,000 shares of a new series of preferred stock designated "Series A Preferred Stock," detachable warrants to purchase up to 1,625,000 shares of Meredith's common stock, and options to purchase up to 875,000 shares of Meredith's common stock, for an amount equal to $650 million in cash.

acquired Time Inc. properties," and "on track to deliver more than $500 million of annual synergies in the first two full years of operations," and expected to "achieve our goals of reducing debt by $1 billion by the end of fiscal 2019 and generating $1 billion of adjusted EBITDA in fiscal 2020, meaningfully contributing to total shareholder return." As set forth below, these claims and many others were materially false and misleading lacked a reasonable basis because Meredith had undisclosed material weaknesses in its internal controls over financial reporting as they pertained to Meredith's ability to value the Time assets, and Meredith misstated the status of Meredith's integration of Time – which was an ongoing, costly failure – and the material cost of remedying its weaknesses in internal controls and the failed Time integration.

34. Analysts reacted positively to Meredith's stated synergy and EBITDA goals and credited the Company's perceived experience with acquisitions and familiarity with Time's business as reasons for their positive outlook. For example, on June 13, 2018, Wells Fargo linked Meredith's claimed ability to achieve $1 billion in EBITDA to the Company's supposed familiarity with Time's assets, writing that, "In our view, MDP's mgmt. is experienced & consistently meets/ beats expectations, so we think the $1B EBITDA figure is achievable, esp. with MDP's familiarity with Time's assets." This vote of confidence in Meredith's ability to successfully integrate Time and achieve earnings unprecedented in the Company's history was belied by the fact that, as discussed below, Meredith lacked effective internal controls over financial reporting to value Time's assets.

### B. Meredith Had Undisclosed Material Weaknesses in Its Internal Controls Over Financial Reporting Tied to the Value of the Time Assets

35. During the Class Period, Meredith knew that it had material weaknesses in its internal controls over financial reporting that would require significant investment to remedy and that the Time integration was failing. Specifically, undisclosed to investors, Meredith had material

weaknesses in its internal controls concerning its ability to accurately value the Time assets, including Time's accounts payable and accounts receivable. As a result of those undisclosed weaknesses, Meredith's statements concerning the anticipated $550 million in synergies and $1 billion in EBITDA for fiscal 2020 that would supposedly result from Meredith's integration of Time's assets were recklessly false when made. In fact, even after Meredith admitted to the existence of those material weaknesses, Defendants continued to tout the purportedly strong financial performance of the acquired Time assets, and claimed that they were driving Meredith's success.

36. Under SEC and PCAOB rules, public companies are required to report any findings of material weaknesses over internal controls. Internal financial controls are a set of policies, processes, and procedures designed to ensure the integrity of an issuer's publicly-reported financial information. Indeed, Meredith's maintenance of adequate internal control systems was critically important to investors because it would ensure that the Company's publicly-reported financial results would be materially accurate and reliable.

37. A material weakness in internal controls over financial reporting exists if a company's control system is flawed such that it is reasonably possible that a material misstatement in that company's financial statements will not be prevented or corrected.

38. Throughout the Class Period, Meredith and its most senior executives assured investors that they maintained an adequate system of internal accounting controls, as mandated by the Sarbanes-Oxley Act of 2002 ("SOX"). In connection with Meredith's SEC filings throughout the Class Period, and pursuant to SOX, Defendants Harty and Ceryanec signed certifications representing to investors that Meredith's internal reporting controls were "fully compl[iant]" and

"fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

39. However, on August 30, 2018, Meredith told the SEC that it would not be able to file its annual report with the SEC on time due to the Time acquisition. In a Form NT 10-K,[9] signed by Defendant Ceryanec, Meredith informed the SEC, "Due to the significant acquisition of Time Inc., the compilation, dissemination, and audit of the information required to be presented in the Annual Report on Form 10-K for the fiscal year ended June 30, 2018, could not be completed and filed by August 29, 2018, without undue hardship and expense to the registrant." Meredith assured the SEC that it would file its 2018 Form 10-K within fifteen days as permitted by Rule 12b-25 of the Exchange Act, and Meredith did so on September 4, 2018.

40. Meredith's late-filed September 4, 2018 Form 10-K stated the following with respect to Time's and Meredith's internal controls over financial reporting:

> On January 31, 2018, the Company completed its acquisition of Time. Management is in the process of evaluating Time's existing controls and procedures, and integrating Time into the Company's internal control over financial reporting. In accordance with SEC staff guidance permitting a company to exclude an acquired business from management's assessment of the effectiveness of internal control over financial reporting for the year in which the acquisition is completed, management has excluded Time from its assessment of the effectiveness of internal control over financial reporting as of June 30, 2018. Time represents 59 percent of the Company's total assets as of June 30, 2018 and 28 percent of revenue for the year ended June 30, 2018.
>
> On the basis of the evaluation performed, management concluded that internal control over financial reporting was effective as of June 30, 2018.

41. The foregoing disclosure thus represented that Meredith was taking no position on Time's own internal controls, but falsely said that Meredith's own internal controls was effective.

---

[9] An NT (i.e., non-timely) Form 10-K filing is a notice from the company stating that the filing deadline for its annual Form 10-K has not been met due to a given reason and that the actual filing will be filed within a specified range of time. An NT 10-K provides an additional 15 days for the actual 10-K to be filed.

Subsequently, without warning, on January 15, 2019, Meredith announced that Defendant Lacy would step down as Executive Chairman of Meredith and retire from the Company, effective March 31, 2019. Defendant Lacy continues to serve as Chairman of the Board of Directors in a non-executive capacity.

42. Then, on April 4, 2019, Meredith revealed to the market that the Company had concluded on March 31, 2019 (the same date as Lacy's previously-announced departure) that, as of June 30, 2018, Meredith had a material weakness in its internal controls over financial reporting concerning the value of the legacy Time assets. Meredith's reevaluation of its internal controls only took place at the urging of the PCAOB, after the PCAOB detected material deficiencies in Meredith's controls and informed Meredith's auditor, KPMG. Meredith's Form 8-K filed with the SEC on April 4, 2019, signed by Defendant Ceryanec, admitted that:

> In connection with an inspection by the Public Company Accounting Oversight Board, KPMG LLP ("KPMG"), the independent registered public accounting firm for Meredith Corporation (the "Company"), communicated to the Company its determination that previously unidentified deficiencies existed in the Company's internal control over financial reporting as of June 30, 2018. <u>These deficiencies related to internal controls over the processes to establish the fair value of certain assets and liabilities in the opening balance sheet for Time Inc. ("Time")</u>, which the Company acquired on January 31, 2018. Solely as a result of these deficiencies, <u>on March 31, 2019, the Company concluded that it had a material weakness in internal control over financial reporting as of June 30, 2018</u>. Due to this material weakness relating to the opening balance sheet of Time, reliance should not be placed on Management's Report on Internal Control over Financial Reporting or KPMG's opinion on internal controls included in the Company's fiscal 2018 Form 10-K. . . .
>
> The Company intends to (1) file an amendment to its fiscal 2018 Form 10-K to appropriately revise Management's Report on Internal Control over Financial Reporting and Evaluation of Disclosure Controls and Procedures and include KPMG's revised report thereon and (2) to amend its intervening quarterly reports on Form 10-Q to appropriately revise the disclosures regarding its disclosure controls and procedures. To remediate the material weakness, the Company is in the process of implementing certain changes to its internal controls.

43. As *The Wall Street Journal* further revealed to the market on the evening of April 4, 2019:

> Meredith Corp. said its auditor, KPMG LLP, found material weakness of the magazine publisher's oversight of accounting related to its acquisition of Time Inc.
>
> A Meredith spokesman said KPMG uncovered shortfalls in oversight of the processes used to calculate the fair value of Time Inc.'s accounts receivable and accounts payable, which were brought across to Meredith's books when it purchased Time on January 31, 2018.
>
> As a result, investors should not rely on either the management's or the auditor's 2018 reports assuring the strength of the company's internal controls over financial reporting, Meredith said in a regulatory filing.
>
> Meredith said the shortfalls in oversight were uncovered in connection with an inspection by the Public Company Accounting Oversight Board of KPMG's audits,[10] the U.S. audit industry watchdog. . . .
>
> The company said it plans to amend its fiscal 2018 full-year report to revise managements' and auditor's assurance report, and is in the process of implementing certain changes to its oversight process.

44. Despite Meredith's admission of material weaknesses in financial reporting, Meredith reassured investors that it did not need to restate its financial results in 2019 and claimed that forthcoming amendments to its public disclosures and planned implementation of changes to its oversight process would rectify the problem. As part of its April 4, 2019 disclosure, Meredith

---

[10] KPMG has an extensive recent history of being rebuked for poor auditing. For example, in 2018, General Electric's audit committee voted to initiate a tender process to replace KPMG as its external auditor because, earlier in 2018, GE revealed that the SEC was investigating GE's accounting practices after a $22 billion goodwill impairment and a $6.2 billion charge in its insurance portfolio. In 2019, the United Kingdom's Financial Conduct Authority fined KPMG 3.5 million pounds for KPMG's failure to audit BNY Mellon bank properly by not detecting that BNY Mellon had been holding more than a trillion pounds in assets on behalf of its customers in a way that violated Financial Conduct Authority rules. KPMG has also had a troubled history with the PCAOB and the SEC. In 2019, a KPMG partner was tried and found guilty for engaging in a scheme to steal the PCAOB's inspection plans in order to help KPMG prepare for the regulator's inspections. In 2019, KPMG also agreed to pay the SEC $50 million to settle claims that it altered audits after they were completed using stolen PCAOB data and to settle claims KPMG auditors cheated on internal exams related to mandatory ethics, integrity, and compliance training.

did not disclose the costs to remedy the material weaknesses in internal controls or revise downward the amount of its existing synergy or EBITDA guidance at that time.

45. Then, on May 10, 2019, Meredith admitted that it would take longer than anticipated to achieve the claimed synergies from the Time acquisition due to problems with the Time integration and weaknesses in Meredith's controls over financial reporting. In Meredith's Form 8-K filed with the SEC that day, Defendant Harty stated: "[W]e believe it will take longer than originally anticipated to achieve the remainder of the synergies due to investment spending to grow the business; retaining certain employees longer than anticipated to ensure business continuity; and operating the Assets Held for Sale longer than expected." Again, Meredith did not disclose any specific increased expense associated with this disclosure.

46. Also on May 10, 2019, despite Meredith's prior admission on April 4, 2019 that it lacked the ability to establish the fair value of "certain assets and liabilities" in Time's opening balance sheet, Meredith declared victory on its goals to integrate the Time assets and improve the financial performance of the legacy Time brands. These claims recklessly misled investors into believing that Meredith's integration of Time (including its valuation of Time's subscription base) was a completed success. For example, on Meredith's May 10, 2019 conference call with investors:

- Defendant Harty said, "While it took longer than we initially expected to turn around the advertising performance [] at the legacy Time brands, we are now in line with Meredith's historical and expected long-term performance";
- Harty pointed to Meredith's past actions related to "investing in more profitable sources of subscription acquisition, particularly because we inherited some low-margin, agent-sourced subscriptions from the acquisition of Time Inc." and claimed that "we are now in line with Meredith's historical and expected long-term performance"; and
- Defendant Werther (then President of Meredith's National Media Group who was primarily responsible for the print media business) claimed that, "[W]e said we

> would improve the print advertising performance of the acquired Time Inc. properties to Meredith's historic levels over time, and we did."

47. It is now apparent that, as of the May 10, 2019 investor call, Defendant Werther knew that his departure from Meredith was imminent, and that he had already negotiated with Meredith a lucrative severance package (that was significantly more valuable than he would have otherwise received). Specifically, on March 21, 2019, Meredith had filed with the SEC an amendment dated March 19, 2019 to Werther's employment agreement that extended his severance period from 12 months to 18 months and provided that all awards of restricted stock units and stock options would automatically vest upon his departure, and that his stock options would be exercisable for the full unexpired term of the options, and Werther later left Meredith on June 10, 2019. As Meredith's 2019 Proxy Statement filed with the SEC on September 27, 2019 summarized, the final terms of Werther's Separation Agreement were the following:

> Werther Separation Agreement Terms. In connection with the termination of Mr. Werther's employment, we entered into a separation agreement with Mr. Werther. The separation agreement provides that Mr. Werther will receive a continuation of his base salary for a period of 18 months and a lump sum payment of $1,060,168 to satisfy any Annual Incentive and Cash LTIP earned. All of Mr. Werther's restricted stock awards and stock options became fully vested and his stock options became exercisable for the remainder of their unexpired terms. Mr. Werther was deemed to have met the age and service vesting requirements specified in our Supplemental Benefit Plan and our Replacement Benefit Plan.[11] Mr. Werther will also receive certain other benefits under the separation agreement including company subsidized Consolidated Omnibus Budget Reconciliation Act ("COBRA") benefits and continuation of executive coaching services. The separation agreement also includes a general release in favor of the Company.

---

[11] For its Supplemental Benefit Plan and Replacement Benefit Plan, the Company imposes an age requirement of 55 years and a requirement of 7 years of "Vesting Service" in order to qualify for receiving these benefits. Defendant Werther was approximately 50 years of age when he departed from Meredith, so he was far short of qualifying for receiving benefits from either the Supplemental Benefit Plan or Replacement Benefit Plan. By operation of Defendant Werther's Separation Agreement, he was deemed to have met both the age and service requirements, and he would not have been otherwise eligible for such benefits.

48. Thus, with no future at Meredith ahead of him, and with his lucrative severance package locked up—whereby much of Werther's net worth was tied to Meredith stock options dependent on Meredith's stock price—Werther claimed to the market on the May 10, 2019 investor call that Meredith's efforts to improve the financial performance of the Time assets had been successful.

49. Specifically, on the May 10, 2019 call, Werther claimed that, to improve the print advertising performance of the legacy Time brands, Meredith had already "reorganized the way these brands went to market," "implemented Meredith's sales and operating strategies, standards and disciplines across the portfolio," "invested in sales and marketing resources and activities" and "aggressively marketed the new portfolio, resulting in increased access to new advertising and marketing budgets."

50. Indeed, Werther claimed, without a reasonable basis—and despite Meredith's admission of a material weakness in internal controls to value the Time assets—that Meredith's third quarter 2019 financial performance was stellar and that this would continue into fiscal fourth quarter 2019. Werther even specifically attributed that performance to the "acquired Time Inc. brands," claiming that they were driving the improvement in Meredith's financial performance:

> [T]hird quarter comparable year-over-year print advertising revenue performance improved significantly and is in line with the performance we expect. Legacy Meredith brands have been performing consistently and the improvement we delivered in our fiscal third quarter was driven primarily by the acquired Time Inc. brands. As we look into the fourth quarter, we anticipate further improvement driven again by many of the acquired brands, some of which look to be up in print advertising revenues year-over-year. . . Looking into the fourth quarter, we anticipate further year-over-year revenue and margin improvement.

51. At the time Werther made these claims to investors, he knew he would not be at Meredith by the end of the fiscal fourth quarter when the Company disclosed the truth about its business and the significant costs of remedying its failed integration.

52. During the question and answer period of the May 10, 2019 investor call, Defendant Harty also responded to an analyst who asked about the "decline and the growth" of "print and digital on a comparable basis." Harty said that the decline in growth of the "print combined portfolio" had slowed, from a 16% decline to a 7% decline, and that "we're finally getting the portfolio of the Time Inc. side turn[ed] around."

53. Analysts reacted positively to Meredith's claims. On May 27, 2019, analysts from Benchmark wrote that "[a]fter all of the doubt surrounding Meredith's . . . ability to fix TIME's print issues, it feels incredibly unfortunate to have to be having a conversation about synergies and timing. . . . At the end of the day, we would simply point out two key reasons for our guarded optimism: 1) Print results have actually exceeded our expectations thus far; 2) Synergies are still expected to be achieved by year-end FY20 . . . . The narrative may have shifted but the value creation opportunity, in our view, has not."

54. In Meredith's revised Form 10-Q/A for the period ended December 31, 2018, which Meredith filed with the SEC on May 14, 2019, in connection with disclosing the existence of its material weakness in internal controls, Meredith disclosed to investors that, whereas Meredith's CEO and CFO (Defendants Harty and Ceryanec, respectively) had supposedly previously concluded that Meredith's "disclosure controls and procedures were effective," Meredith management had:

> reevaluated its internal control over financial reporting as of September 30, 2018, and concluded that there was a material weakness in the Company's internal control over financial reporting relating to purchase accounting[12] for the opening balance sheet of Time Inc. (Time). More specifically, management identified ineffective process-level controls over the completeness, existence, accuracy, and valuation of certain acquired assets and assumed liabilities on the acquisition date of January

[12] Purchase accounting is the practice of revising the assets and liabilities of an acquired business to their fair values at the time of the acquisition. This treatment is required under Generally Accepted Accounting Principles ("GAAP").

> 31, 2018, specifically, accounts receivable; property, plant, and equipment; other current assets; other assets; accounts payable; accrued liabilities; unearned revenues; and other noncurrent liabilities, and over the review of certain revenue contracts relating to amounts recorded in unearned revenue, due to an ineffective risk assessment process over the measurement and recognition of certain acquired assets and assumed liabilities of Time.

55. Meredith thereby admitted that it truly had no ability to judge the value of the Time assets it had acquired, including Time's accounts receivable, property, current assets, accounts payable, accrued liabilities and unearned revenues. Yet, again, Meredith and the Executive Defendants hid from investors the true financial state of the Company and the costs to remedy these shortcomings, and instead continued to misrepresent the purported success of Meredith's integration of Time. For example:

- On June 10, 2019, Harty claimed that "We have turned around the advertising performance of the print brands we acquired, grown the digital business, and significantly increased consumer revenues"; and

- On August 28, 2019, Meredith "reiterated that it expects full-year fiscal 2019 financial results to be in line with the outlook provided in its fiscal 2019 third quarter earnings release."

56. On August 30, 2019, in a Form NT 10-K filed with the SEC that day and signed by Defendant Ceryanec, Meredith announced another delay to the filing of its annual report on Form 10-K relating to internal financial control weaknesses. The Form NT stated that:

> Meredith Corporation (Meredith or the Company) is unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2019, within the prescribed time period because it requires additional time to complete its financial statements and its assessment of the Company's internal control over financial reporting; accordingly, the Company's independent registered accounting firm, KPMG LLP, has not yet completed its audits of the Company's financial statements and the Company's internal control over financial reporting as of June 30, 2019. Meredith anticipates that it will file its Annual Report on Form 10-K for the fiscal year ended June 30, 2019, as soon as possible and within the fifteen-day grace period provided by Rule 12b-25 of the Securities Exchange Act of 1934, as amended.

57. On September 5, 2019, Meredith shocked investors with the release of fiscal 2019 fourth quarter and full year financial results. Due to Meredith's lack of internal controls, resulting inability to measure the Time Inc.'s assets, and failed integration of Time, Meredith was forced to admit its integration costs were much higher than previously represented. In its September 5, 2019 press release announcing the results, and contrary to its prior representations:

- Harty admitted that it had "taken longer than we initially expected to elevate the print and digital performance of the Time Inc. assets," and that "comparable advertising performance lagged Meredith's expectations in the first half of fiscal 2019";

- "Meredith recorded <u>$94 million of net after-tax special items in fiscal 2019</u>, primarily related to restructuring and integration costs related to the Time Inc. acquisition";

- "Looking more closely <u>at fiscal 2019 fourth quarter results</u> compared to the prior-year period: . . . Loss from continuing operations was $4 million, or $0.51 per share, including <u>$62 million of net after-tax special items</u>, primarily related to restructuring and integration costs";

- Harty said, "<u>[W]e begin fiscal 2020 at a lower profit point than originally expected</u>. In addition, we are planning strategic investments to further strengthen our performance and maximize shareholder value over time. Both of these factors contribute to a <u>reset of our financial expectations</u> in the outlook we're providing"; and

- "For full-year fiscal 2020, Meredith expects: . . . . Adjusted EBITDA to range from <u>$640 million to $675 million</u>, and adjusted earnings per share to range from $5.75 to $6.20. This includes approximately $50 million of planned strategic investments."

58. On the September 5, 2019 investor conference call accompanying Meredith's release of its fiscal fourth quarter and full year 2019 results, Harty purported to explain what drove Meredith to significantly underperform the guidance it had previously provided to its investors:

> [W]e acknowledge the challenges we faced that resulted in a reset of EBITDA expectations for fiscal 2019 and going forward. Foremost, <u>it took longer than expected to turn around advertising performance with the legacy Time Inc. brands</u>.
>
> Additionally, <u>the number of low-margin magazine subscriptions we encountered inside the legacy Time Inc. brands were more than anticipated</u>. Both issues required

> additional investment spending and impacted our EBITDA generation. Once recognized, we tackled these issues head on and we are confident in the plan and the approach we're taking in fiscal 2020 and beyond. As a result, we begin fiscal 2020 at a lower profit point than originally expected which contributes significantly to the outlook we're providing.

59. Following Harty, Defendant Ceryanec announced a scaled-back outlook for full-year fiscal 2020, a far cry from the $1 billion in EBITDA Meredith had previously extolled as an inevitable result of its integration of the Time assets, which remained incomplete:

> Now turning to our outlook for full fiscal 2020. We expect total company revenues to range from $3 billion to $3.2 billion. Earnings from continuing operations to range from $197 million to $212 million and from $2.58 to $2.88 on a per share basis. These amounts do not include special items and our actual results may include special items that have not yet occurred and are difficult to predict with reasonable certainty. <u>We expect full fiscal 2020 adjusted EBITDA to range from $640 million to $675 million and adjusted earnings per share to range from $5.75 to $6.20.</u>
>
> As Tom mentioned, while we've accomplished many of the acquisition-related goals that we set for ourselves[,] <u>[w]e acknowledge that we are not where we thought we would be at this point in time.</u> As a result, we're resetting the EBITDA expectations for fiscal '20 and going forward. Now this outlook is informed by the factors that Tom mentioned, but it's also informed by the completion of a rigorous budgeting process for fiscal '20 that's based on the results we've delivered since acquiring the Time brands and businesses 19 months ago.

60. In addition to admitting that Meredith and its executives were wrong about their ability to integrate Time's assets on a short timeframe – i.e., to "hit the ground running" – Ceryanec confirmed that, based upon outside verification, Meredith would not attain the more than $500 million in synergies on the schedule it promised to investors, as a result of the Time acquisition:

> [F]ollowing the change in guidance that we communicated on our last earnings call in May, we engaged outside support to: one, <u>verify the cost synergies we originally identified and determined that we had achieved them</u>; two, help us identify additional cost synergies; and three, assist with the development of a zero-based budget. <u>As a result of this work, we can confirm that we achieved $430 million of synergies through fiscal 2019, which is actually more than we had originally expected, but which somewhat reduces our 2020 expectations.</u>

61. As Meredith thereby disclosed, its previously-reported synergies were so questionable that it needed to retain "outside support" to "verify" the amounts it had originally identified to determine that Meredith had achieved them. In addition, Ceryanec's claim that $430 million in synergies was "actually more than we had originally expected" was false. As Defendant Lacy had said more than a year earlier, on Meredith's May 10, 2018 investor call, Meredith had "expect[ed] to exceed the high end of that [$400-$500 million] range, the $500 million mark."

62. Finally, Ceryanec commented on Meredith's 2020 budget outlook, revealing further prior misrepresentations by Meredith in connection with the Time acquisition's purported benefits and synergies:

> On the National Media Group, we have more moving parts [than the Local Media Group]. On the plus side, we expect to deliver an incremental $135 million of synergies in fiscal 2020. We also expect growth in digital ad revenues. We expect print ad revenues to decline in the mid-single digit range in line with Meredith's industry-best historic levels. We expect lower contribution from consumer-related revenues due primarily to the lower-margin subscribers we acquired with the legacy Time Inc. brands, and we also expect higher production and distribution expenses, including an expected post rate increase.

63. When Meredith finally filed its Form 10-K on September 13, 2019, it included for the first time the following dire Risk Factors as they related to Meredith's weaknesses in its internal controls over financial reporting and the serious risks to Meredith's business going forward, including the risk of harm to its stock price and litigation against the Company:

> We identified material weaknesses in our internal control over financial reporting. As described in Item 9A - Controls and Procedures of this report, during fiscal 2019 the Company determined that deficiencies existed in the Company's internal control over financial reporting. As a result of these deficiencies, management concluded that we had material weaknesses in our internal control over financial reporting as of June 30, 2019. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.

> Maintaining effective disclosure controls and procedures and effective internal control over financial reporting are necessary for us to produce reliable financial statements. There can be no assurance that other material weaknesses will not arise in the future. The development of new material weaknesses in our internal control over financial reporting could result in material misstatements in our consolidated financial statements and cause us to fail to meet our reporting and financial obligations, which in turn could have a material adverse effect on our financial condition and the trading price of our common stock, and/or result in litigation against us. In addition, even though we have strengthened our controls and procedures, those controls and procedures may not be adequate to prevent or identify irregularities or facilitate the fair presentation of our consolidated financial statements or our periodic reports filed with the SEC.

64. In addition, the Consent of Independent Registered Public Accounting Firm from KPMG that Meredith filed with the September 13, 2019 Form 10-K disclosed new weaknesses in Meredith's internal controls, stating the following:

> Our report dated September 13, 2019, on the effectiveness of internal control over financial reporting as of June 30, 2019, expresses our opinion that the Company did not maintain effective internal control over financial reporting as of June 30, 2019, because of the effect of material weaknesses on the achievement of the objectives of the control criteria and contains an explanatory paragraph that states that the following material weaknesses have been identified and included in management's assessment:
>
> - ineffective controls over the completeness, existence and accuracy of digital advertising revenue, related accounts receivable and selling expense.
>
> - ineffective controls over the completeness, existence, accuracy and valuation of international pension assets.
>
> These ineffective controls are related to ineffective risk assessment under the COSO Framework, including the documentation of controls.

65. On October 1, 2019, as further evidence of the significant deficiencies in Meredith's accounting controls and reporting, Meredith announced the sudden retirement of Defendant Ceryanec from his position as CFO. The press release announcing Ceryanec's impending departure stated that "Ceryanec has agreed to stay in his role for a transition period through early calendar year 2020 while Meredith conducts a national search for his successor."

### C. Meredith Hid from Investors the Failed Time Integration, the Extent of Low-

**Margin Subscriptions, and the High Costs to Remedy Them**

**1. Meredith Misled Investors About the Purported Success of the Time Integration**

66. As set forth above, on May 10, 2019, Meredith disclosed the need to extend the timeframe for achieving its claimed synergies from its acquisition of Time, including due to "investment spending to grow the business [and] retaining certain employees longer than anticipated to ensure business continuity." Then, on September 5, 2019, Meredith disclosed to investors that it had "taken longer than we initially expected to elevate the print and digital performance of the Time Inc. assets." Meredith further disclosed that day $62 million of net after-tax special items just in fiscal fourth quarter 2019, a "reset of our financial expectations," and that "the number of low-margin magazine subscriptions we encountered inside the legacy Time Inc. brands were more than anticipated."

67. Yet, throughout the Class Period, to artificially inflate Meredith's stock price and hide from investors the serious problems Meredith was experiencing trying to integrate Time's operations with its own, Defendants repeatedly claimed to the market that Meredith started out with an integration plan to "hit the ground running" on integrating Time, that Meredith was implementing Meredith's strategies, standards and disciplines to improve performance across its entire portfolio (including legacy Time brands), and that, by February 2019, Meredith had "fully integrated" Time's Human Resources, Finance, Legal and Information Technology functions into its own.

68. These statements misled investors into believing that Meredith had seamlessly integrated Time and was on track to realize the claimed synergies and $1 billion of EBITDA by fiscal 2020. For example:

- On January 31, 2018, when Meredith announced the completion of its purchase of Time, Harty told investors that "teams from Meredith and Time have been

developing an integration plan that has positioned us to hit the ground running" and "[w]e look forward to delivering on our pledge to achieve the identified synergies and grow shareholder value";

- In a January 31, 2018 Meredith press release, the Company stated that "Meredith has an excellent track record of achieving cost synergies with prior acquisitions, and is confident in its ability to optimize the cost structure of the combined business";

- On March 21, 2018, Meredith issued a press release discussing the status of its integration of the legacy Time brands. In it Meredith wrote that its "strategy centered on four major initiatives," including to "Achieve annual cost synergies in $400 million to $500 million range in first two years of operations" and "Improve advertising and circulation performance of the Time Inc. properties to industry norms." The press release quoted Defendant Harty as claiming, "We have made significant progress executing on these initiatives since we closed on the acquisition just six weeks ago"'

- During Meredith's January 31, 2018 investor call, Harty claimed that "we've hit the ground running";

- On Meredith's May 10, 2018 investor call, Lacy updated investors and claimed that Meredith was "very pleased with the integration work so far, including the progress we're making on cost synergies that we expect to achieve," which "we now expect to exceed the high end of that range, the $500 million mark";

- On August 10, 2018, Meredith assured investors that the Company was "very pleased with the progress being made on integrating the acquired Time Inc. properties," and "on track to deliver more than $500 million of annual synergies in the first two full years of operations," and expected to "achieve our goals of reducing debt by $1 billion by the end of fiscal 2019 and generating $1 billion of adjusted EBITDA in fiscal 2020, meaningfully contributing to total shareholder return";

- On Meredith's August 10, 2018 investor call, Harty asserted that Meredith had "quickly implemented Meredith's strategies, standards and disciplines across the portfolio to improve performance" and was "seeing Time Inc. improve as we've kind of implemented our strategies and we're going to see sequential improvement as we go through the fiscal year";

- On November 7, 2018, the Company claimed it was "implementing its proven strategies, standards and discipline across the legacy Time Inc. portfolio to improve performance, including aligning it with Meredith's successful sales structure"; and

- On February 11, 2019, Harty claimed that Meredith had "fully integrated our HR, finance, legal and IT functions."

69. Each of the foregoing statements misstated the actual state of affairs within Meredith, as it struggled to integrate Meredith and Time's finance and internal audit functions, and understood the need to increase the margins on the legacy Time low-margin subscriptions.

70. Defendants' claims to investors about the successful execution of the integration misled investors and analysts. For example:

- In a March 21, 2018 analyst report entitled "MDP [Meredith]: Provides Update On Time Inc. Integration Plan – No Big Surprises And It Seems To Be On Track," Wells Fargo responded favorably to Meredith's March 21, 2018 press release discussing the integration and wrote that "We like the acquisition of TIME and see potential upside to announced synergies, as well as better execution on TIME's underperforming assets";

- On May 10, 2018, following Meredith's investor call that day, a Wells Fargo analyst wrote that "Synergies are now $500MM-PLUS (from the original $400-500MM)" and Jefferies wrote that "Integration Efforts Under Way" and "Upping Synergy Expectation – Expect $1B in F20 EBITDA";

- On May 15, 2018, Benchmark reported that "It is very clear that this is solidly an execution story, but at least we view the path to success as incrementally more clear";

- In its June 28, 2018 report, William Smith & Co. reiterated Meredith's claim from its May 10, 2018 press release discussing earnings, that "we are aggressively focused on successfully integrating the acquired Time Inc. properties";

- On May 17, 2019, Benchmark lauded Meredith for its ability to improve the margins on legacy Time subscriptions through direct-to-consumer campaigns: "With a larger portion of the rate base stemming from inorganic sources than expected, Meredith is now running (surprisingly highly efficient) direct mail campaigns, among other things, to improve both the margin profile and LTV of TIME's sub[scription] base. The good thing is that, in our view, Meredith's argument that they had the playbook for TIME's print already figured out proved true, and this type of subscriber re-engagement/acquisition should be standard fare for the Company, giving us optimism around the final outcome"; and

- On June 10, 2019, Benchmark reported that "We recently hosted Meredith management on a non-deal roadshow. The biggest takeaway was that the Company appears to be generating positive momentum heading into their fiscal 4th quarter. . ."

### 2. Meredith Knew Throughout the Class Period, and Hid from Investors, That It Failed to Integrate Time's Finance and IT Functions

71. In contrast to the above assertions, including Defendants' claims that Meredith had a plan to "hit the ground running" on the integration, and that they were "very pleased with the progress being made on" the integration, Meredith was woefully unprepared and did not integrate Time's much larger and more complex operations when it was telling investors it already had. For example:

- FE 1[13] reported that "Meredith bought Time, a sinking ship that was also on fire, yet Meredith thought it could turn it around quickly but got in and realized that there was a lot more than it could handle and that it had bit off more than it could chew"; and
- FE 2[14] said that it was hardly credible that Meredith had planned to hit the ground running because "they bought [Time] and had no clue what they were doing."

72. Likewise, FE 3[15] stated that the integration was "kind of a mess." FE 3 explained that Meredith was "consistently behind the integration schedule because the requirements that Meredith put out were not humanly possible." FE 3 said, "It seemed as if nothing had been set up in advance of the acquisition. We were working 60-80 hour weeks to try to get back on schedule in terms of integrating the IT audit functions and getting into compliance, but it was not improving." FE 3 compared the integration process to playing a football game, and then at half time being told they were switching to basketball rules. When FE 3 left the Company in June 2018, they were "at least two months behind and it seemed as if it was only getting worse. We were working from square one. If there was any due diligence done [before the acquisition] it

---

[13] FE 1 was a National Sales Account Executive at Meredith from before the Class Period until April 2019.
[14] FE 2 was a Head of Branded Media Content Licensing at Meredith from before the Class Period until April 2019.
[15] FE 3 was an Internal Audit IT Manager at Meredith from before the Class Period until June 2018.

wasn't on the IT side. Time had their ducks in a row but there was no ground work laid from Meredith." FE 3 said that Defendants' refrain that Meredith was "hitting the ground running" was untrue, at least from an IT perspective, because "they hit the ground[] [b]ut they landed in a big pile of quicksand and just sank to the bottom."

73. In addition, contrary to Defendants' claims that Meredith was "on track" to achieve the stated synergies, that Meredith was "implementing its proven strategies, standards and discipline across the legacy Time Inc. portfolio to improve performance, including aligning it with Meredith's successful sales structure," or that Time's HR, finance, legal and IT functions were "fully integrated" as of February 2019, Meredith's and Time's operations were not fully integrated.

74. In fact, a few months after Meredith's acquisition of Time, Meredith decided internally to run the Meredith and Time systems in parallel, rather than integrate them, and the finance systems were not integrated until August 2019. As FE 4[16] stated, "there was no real integration of the two companies after the acquisition." FE 4 said that, only a few months after the acquisition, Meredith tried to roll Time's operations into Meredith's ERP system and failed. FE 4 explained that, "The person running it on the Meredith side realized it wasn't going to work and that's when the decision was made to run it in parallel." Similarly, FE 4 said, "The original plan was to take everything finance related through [Meredith's headquarters in] Des Moines but they realized it couldn't happen and so decided to keep it parallel instead." After Meredith decided to keep the systems running parallel, FE 4 saw the attempts to integrate stop and was told that it was "business as usual until the integration was ready to go."

[16] FE 4, an Accounts Payable Manager at Time from before the start of the Class Period until January 31, 2019, was responsible for accounts payable at the Time business units.

75. FE 4 said his manager from Meredith "knew it was going to be mission impossible" to integrate the systems. FE 4 said there were "still two entirely separate finance systems" when he left on January 31, 2019, with legacy Time operating on PeopleSoft and Meredith using Oracle. People to whom FE 4 spoke, who remained on extended contracts with Meredith, told him the finance systems were not integrated until August 2019. FE 4 said IT personnel were also extended because of Meredith's failure to integrate IT functions. FE 4 said that when he was still at the Company, the legacy Time employees would be "laughing to each other because we knew sh*t was going to hit the fan when we were gone because Meredith had not realized what they had gotten themselves into."

76. FE 8[17] provided additional corroboration regarding Meredith's failed efforts to integrate the PeopleSoft and Oracle platforms. Indeed, according to FE 8, as of May 22, 2018, Meredith planned that the target completion date for integrating Time's PeopleSoft platform and Meredith's Oracle platform was February 28, 2019. This was weeks after the date that Meredith later claimed–February 11, 2019–that it had integrated Meredith and Time's finance and IT functions (when it had not). The PeopleSoft to Oracle integration project was the largest and most complex integration project at Meredith from a scope and impact standpoint, as it involved all accounting and financial reporting processes.

77. Furthermore, FE 8 explained, on August 13, 2018, a "Red" status report was distributed internally at Meredith that identified certain primary risks of the integration at that time. Those risks included that Meredith and Time were not aligned with one another on processes and plans for the planned upcoming Accounts Payable pilot integration. The August 13, 2018 status

[17] FE 8 was a Director of Finance and Accounting Transformation at Meredith and a legacy Time employee since before the Class Period until January 2019.

report also stated that the Chart of Accounts mapping between Time and Meredith accounts may not be completed by August 24, 2018. That was an issue because Meredith had planned to launch the pilot for the Chart of Accounts mapping on August 24, 2018, but Meredith would be unable to launch it by that time.

78. Then, on October 19, 2018, another internal "Red" status report was distributed internally at Meredith, which was when, according to FE 8, the project truly began to "tail-spin." As the report stated, key deliverables were not started or de-scoped (i.e., Meredith did not have a Procurement Policy, the integration team felt Meredith needed one and offered the Time policy as a baseline, but the Meredith Controller deemed it "unnecessary"). According to FE 8, certain additional problems drove the "Red" status of the status report, including: (i) a change in the go-forward accounts payable process for the Accounts Payable Module; (ii) no replacement for Electronic Data Interchange/automated invoice processing; (iii) failure to finalize the Meredith Procurement Policy; and (iv) the lack of a defined Requisition Process.

79. FE 4 and FE 8's statements are further corroborated by several other former employees who described the operations at Meredith and Time running in parallel with one another during the supposed integration, rather than being integrated. Each of the material undisclosed deficiencies detailed below would necessarily require significant, undisclosed financial investment by Meredith to remedy:

- FE 5[18] stated that, by the time he left Meredith in January 2019, the Company was <u>still trying to figure out how to merge the legacy Time and Meredith financial systems</u> to speak to each other, and they were still running <u>parallel profit and loss statements</u>;

- FE 1 explained that "after the acquisition, <u>the Company failed to integrate systems</u> and instead still had <u>two companies with systems that didn't talk to each other</u>."

[18] FE 5 was a Vice President Marketing at Meredith Corporation and a legacy Time employee since before the Class Period until January 2019.

From his perspective, the integration of Meredith's Salesforce sales platform was a main issue and "very short-staffed," with five to ten people in Des Moines trying to merge all the data together, but they could not do it fast enough;

- FE 6[19] said that when he left Meredith in July 2018 "there were still two companies operating in parallel." He added that, "We were still running around with our heads cut off because they let go all of Time's leadership"; "Meredith people were doing double duty but not doing anything well"; and from a financial perspective, he did not see any integration realized;

- FE 2 experienced problems because Meredith failed to merge the pricing for Meredith and Time assets. As a result, FE 2 would sell advertising space to a customer using the Time system of sales and line items, but Meredith would refuse to honor the sale. This would result in a significant amount of pushback over the price difference in a line item due to the failure to merge the two pricing systems; and

- FE 7[20] was brought in in June 2018 to help with accounting work, but stated that Meredith's systems were not ready to handle Time's systems because Time's systems were not only larger but more detailed. The information entered into Time's systems was not properly aligned or transferred to the Meredith system, and Meredith lacked the capacity to do anything about it.

80. More specifically, FE 7 worked as a Finance Manager/Consultant for Advertising Revenue at Meredith from July 2018 until June 2019. FE 7 stated that Meredith failed to properly transition Time's financial systems to Meredith after the acquisition. At Meredith, FE 7 performed the monthly accounting closes and financial analysis for advertising revenue, during which time FE 7 observed Meredith's failure to merge the Time and Meredith financial systems because the Company would use three or four sets of books and three or four different financial systems at the close of the month, instead of just one. In FE 7's words, "You can't have four sets of books in a Company," as "it leads to the inability to have transparency."

[19] FE 6 was an Associate Director, Internal Audit at Time from before the Class Period until July 2018.

[20] FE 7 was a Finance Manager at Meredith from June 2018 until June 2019.

81. Furthermore, FE 7 said that Meredith did not check to make sure that all expenses and revenue were in for a given month. As FE 7 stated, there were no checkpoints, and in accounting, a company needs to have checkpoints.

82. According to FE 7, Meredith's Des Moines headquarters would not share the financials with New York once New York sent its financials to headquarters, such that personnel in New York would not know how their financial numbers were translated or listed from the hand off point on. FE 7 stated that Meredith would close the books in New York, send the information to Des Moines, and then it went into a black hole: "At the end of the day, there was no way to know what financials were actually reported."

83. FE 7 also stated that Meredith was unable to support the detailed financial reporting that went along with Time's more complicated dealings such as "barter deals." In barter deals, Time was making deals with customers that would use sports tickets or commodities in exchange for business. FE 7 stated that Time knew how to report these transactions and Meredith did not. Meredith simply booked an advertisement as an advertisement and "called it a day." FE 7 stated that everything must be accounted for, but Meredith's Des Moines operation was too simplistic. Time's systems were in place to account for this, but Meredith tried to force the data instead.

84. FE 7 also stated that there were "a lot" of missing entries. For example, there was a pool of uncollected funds from advertising revenue, and Meredith had no "beat" on this. If the New York office made $2 million from sales deals that included products and tickets to an event, only a portion of it, such as $1.5 million, would be shown in the Meredith financials. Meredith also sold its products on Amazon, and Meredith's finance department would receive revenue reports from such third parties, but Meredith had trouble reporting it in its financial systems.

85. FE 7 stated that when Meredith acquired Time, it got rid of the financial management personnel in New York, and took it over, but failed to evaluate or clean up the data. FE 7 added that every segment of the business was impacted by the lackadaisical approach to financials that Meredith took. FE 7 stated that the problems started when Meredith let personnel go a few months after the acquisition. Meredith gave many employees their layoff notices with a six-month window before they were officially let go, which led to problems because the legacy Time personnel did not care as much anymore. Others left before the six months ended, which led to abrupt issues and nobody to do the work.

86. Meredith's third party audits of Time's financial information were also inadequate. FE 7 stated that, during his time, KPMG did not ever perform a full comb-through of the books in New York. The auditors that KPMG sent to New York were "very junior" and a "joke." The individual who audited Meredith in New York was "a year out of college" and would not know the carrying value of assets. KPMG did not have a "consistent person" who knew Meredith's business and audited it. FE 7 added that Meredith's auditors did not audit Meredith on a quarterly basis,[21] and the KPMG people that FE 7 dealt with had to be walked through the whole process – i.e., the annual financials and ensuring that the Company recorded revenue correctly – and it was one of the shortest audits she had ever experienced. FE 7 stated that the KPMG audit lasted two or three days, and he would never hear from the auditors as to whether there were any discrepancies: "We were in the dark. No idea if there were warnings."

87. FE 6, a former director of internal audit at Time, stated that the new director of internal audit from Meredith following the acquisition was in "way over his head." FE 6 said,

[21] This is corroborated by KPMG's Preferability Letter filed with the SEC on May 14, 2018 as part of Meredith's May 15, 2018 Form 10-Q, in which KPMG wrote, "We have not audited any financial statements of the Company as of any date or for any period subsequent to June 30, 2017."

"His personal experience was limited. Meredith was the biggest company he had worked at and had never dealt with any acquisitions." Meredith only had one director of all audit. By contrast, at Time, FE 6 explained, there were multiple senior directors of audit looking after various audit functions, including information technology, internal, and Sarbanes-Oxley Act compliance. FE 6 said the senior directors all reported into a vice president and a senior vice president running the whole internal audit operation.

88. Within a week of the acquisition being finalized, FE 6 said that Meredith gave all of these senior internal audit staff exit packages, and they left. FE 6 and the rest of the director-level auditors then rolled up under Meredith's director, who clearly "had no idea what he was doing." FE 6 stated that it was simply too much work for the sole Meredith internal audit director to handle, especially remotely since he worked at Meredith's headquarters in Des Moines. FE 6 stated that Meredith's processes were not robust enough to handle the types and complexities of the internal audits Time regularly performed. FE 6 explained that Time had a lot of systems that were very old, and therefore had custom applications to deal with them. FE 6 said, "It's not going to be [something that's able to] plug and play into any other ERP or general ledger application. To do that requires years of implementation. It was inevitable to have to have lots of work arounds." Although FE 6 was not directly involved in the acquisition due diligence, he said these systems were obvious and could not have been hidden.

89. Similarly, FE 8 said that at a very high level of the Company, the integration "was not going well." Meredith's integration of Time was failing so thoroughly that FE 8 said that, by August of 2018, and then again in October 2018, the status of Meredith's integration of Time was internally flagged as "red" because it was "not heading in the right direction," and that contrary to the Company's representation that Meredith's and Time's finance and IT functions were integrated

as of February 2019, they were not. FE 8 said, "The timelines Meredith had put into place were completely unrealistic. Even though they thought it was going to be done by January 31 [2019], a lot of the project plans didn't reflect January dates. Even on these rushed plans the dates were pushed out further than that." FE 8 said that the longer timeline was reflected in the integration plan that Meredith's Integration Steering Committee oversaw. FE 8 explained that the Steering Committee's purpose was to approve changes to and track the status of the integration plan. FE 8 recalled that the Steering Committee meetings "definitely included" Meredith's CFO, Defendant Ceryanec, and also the Meredith Controller and Vice Presidents from the Finance department. The Steering Committee members were aware of Meredith's delays and extended timelines.

90. With respect to designation the integration of Time's assets as "red," FE 8 said this caused a bunch of internal frustration. FE 8 explained that calling "red" on a project meant that the "project's timing and/or budget were going to be significantly impacted."

91. With respect to Meredith's integration of Time, FE 8 said, "There was a huge gap in the requirements and processes that were supposed to be documented. They were not being addressed by Meredith, and the deficiencies were going to cause major downstream impacts. These were major gaps that would have impacted the deliverables of the integration project." FE 8 said that the status of the integration never moved off "red" before he left Meredith because, "[t]here were still major things being skipped or ignored. It wasn't going to get done the right way."

92. Overall, unbeknownst to investors during the Class Period, Meredith's integration of Time was a disaster and Meredith lacked certain critical functions and personnel that necessitated significant additional spending. Indeed, Meredith only disclosed to investors on May 10, 2019 the need to retain Time personnel longer than anticipated because of the difficulties with

the integration. However, Meredith came to that realization much earlier. FE 4 said that several months before he left on January 31, 2019, Meredith was pushing back integration tasks and realized they "bit off more than they could chew," so they chose "select people from Time and extended their contracts because it was not as smooth sailing as Meredith said it was going to be." When FE 4 spoke to some of the employees whose contracts were extended, he said they told him, "It was getting really convoluted trying to integrate the systems and it was not going well."

### 3. Meredith Knew of the Consistent Threat from Costly Low-Margin Subscriptions in the Legacy Time Properties Throughout the Class Period

93. As discussed above, at the end of the Class Period, on September 5, 2019, Meredith admitted to investors that it would not achieve the claimed $1 billion in EBITDA in fiscal 2020 but would instead earn closer to $660 million. The Company also disclosed that it "recorded $94 million of net after-tax special items in fiscal 2019, primarily related to restructuring and integration costs related to the Time Inc. acquisition" – including $62 million specifically for that fiscal quarter. Harty attributed the need for these charges to the fact that "it took longer than expected to turn around advertising performance with the legacy Time Inc. brands" and that "the number of low-margin magazine subscriptions we encountered inside the legacy Time Inc. brands were more than anticipated." He added that "Both issues required additional investment spending and impacted our EBITDA generation" but that, "[o]nce recognized, we tackled these issues head on." On September 5, 2019, Ceryanec also disclosed that Meredith expected "lower contribution from consumer-related revenues due primarily to the lower-margin subscribers we acquired with the legacy Time Inc. brands."

94. But, as alleged in detail below, Defendants were well aware of the existence and scope of Time's low-margin subscriptions throughout the Class Period, and at least by the time Meredith acquired Time. Defendants accordingly acted with severe recklessness, at a minimum,

when they claimed success from the integration, and they failed to disclose the true cost of reducing the legacy Time brands' reliance on low-margin subscriptions.

**a. Meredith and Time Used Low-Margin Subscriptions to Boost Their Circulation Numbers**

95. Publishers like Meredith derive their main source of revenue from selling advertising space in their magazines to advertisers. Generally, advertisers want to place their advertisements in publications that will reach the largest, most targeted consumer audience for their products. One key metric that advertisers rely on when making that decision is a publication's circulation totals. Accordingly, it is critically important for publishers to report accurate circulation numbers and maintain the stated circulation numbers over time.

96. So-called "low-margin subscriptions" sold through third-party agents are one method that publishers like Meredith and Time use to achieve and maintain their stated circulation numbers. In this context, an "agent" is a person or entity independent from a publisher who solicits subscriptions from consumers, groups or institutions. An example of a well-known sales agent is Publishers Clearing House.

97. As FE 1 explained, low-margin subscriptions allow advertising sales representatives to inflate the number of subscribers that an advertising client's promotions would reach. Specifically, he explained that Meredith does this to command advertising dollars, and to inflate the Company's "certified subscriber rate." A certified subscriber rate is determined through an audit (discussed further below) and shows the subscription history and expectations going forward, determining how many advertising dollars are focused on a single brand.

98. FE 1 added that <u>Meredith was fully aware of low-margin or "filler" subscriptions</u>. FE 1 called them "leader deals, where [a consumer receives] a title like *Better Homes & Garden* and receive[s] another magazine subscription for $1." FE 1 explained that they were called loss

leaders and that "these deals are used to inflate a magazine's annual United States Postal Service required statement of ownership, management and circulation at the end of the year." The U.S. Postal Service Statement of Ownership, Management, and Circulation Statement (the "U.S.P.S. Statement") lists all of a publication's subscriptions, complimentary copies and requested copies from advertisers. According to FE 1, "The U.S.P.S. statement lists everything printed by the Company."

99. FE 9[22] corroborated that low-margin subscriptions, or filler circulation, were the result of the fact that magazines often pay third parties to obtain subscriptions on their behalf – essentially buying subscriptions in order to increase the number of consumers who view their magazine ads.

100. As part of these agent subscription arrangements, the publisher and the sales agent agree ahead of time on the price that the agent will pay the publisher to sell a certain number of subscriptions. As a result, the publisher will know the precise margin of its low-margin subscriptions at the outset of its sales agent agreement. The price at which a publisher will sell a subscription to an agent (minus the agent's commission) is called the "remit" price. The remit price will often be substantially less than the retail prices offered directly by the periodical to consumers.

101. Throughout the Class Period, Meredith knew the precise amount of and prices for low-margin subscriptions at the legacy Time brands, their financial impact on Meredith's revenues and the costs to remedy them, but hid those adverse facts from investors until September 5, 2019.

[22] FE 9 was a Manager, Finance & Strategic Planning, Consumer Marketing & Revenue at Meredith and Time from before the Class Period until September 2018.

Instead, Defendants repeatedly claimed that Meredith was already focused on and had addressed the issue of low-margin subscriptions in the legacy Time titles. For example:

- In a May 10, 2018 press release, Meredith claimed it was "implementing its proven strategies, standards and discipline across the legacy Time Inc. portfolio to improve performance, including aligning it with Meredith's successful sales structure." The press released continued, "Regarding circulation, Meredith has launched a large-scale initiative to use its much larger subscription database to cross-promote titles to increase circulation revenue and lower subscription acquisition costs"; and

- On May 10, 2019, Defendant Harty pointed to Meredith's actions related to "investing in more profitable sources of subscription acquisition, particularly because we inherited some low-margin, agent-sourced subscriptions from the acquisition of Time Inc."

102. These statements were knowingly or recklessly false when made because Meredith knew that low-margin subscriptions remained a problem within the Time properties and that those subscriptions would require Meredith to make significant additional investments to generate more lucrative subscriptions through non-agency sales. Meredith's awareness of the amount of low-margin subscriptions is evidenced by how: (i) Time scrupulously tracked every detail of its customers' subscriptions and provided that data to Meredith as part of the acquisition; and (ii) a third party firm audited Time's legacy titles and reported on the precise average subscription price for each legacy Time magazine title and the channels through which each was sold.

**b. Time Tracked and Cataloged Details on Each of Its Subscribers that Revealed Low-Margin Subscriptions**

103. Former Meredith and Time employees describe that Meredith was well aware of the existence and scope of the legacy Time low-margin magazine subscriptions that Time used to prop up its subscription numbers, which were also known as "filler circulation" at Meredith. This was particularly true because Time scrupulously tracked every detail of its customers' subscription data in internal databases that Time provided to Meredith in connection with the acquisition.

104. FE 10[23] was responsible for the agreements that subscriptions that agents used to sell on Time's behalf. FE 10 explained that Time negotiated the remit rate with the third parties annually and incorporated it into approximately four-page contracts. Upon receiving approval from Time's law department, FE 10 would send agreements to the agents, detailing the terms and prices the agents could use. FE 10 stated that Time had entire divisions of employees who tracked subscriptions, including his former division, Consumer Marketing and Revenue, for which he focused on retention of magazine subscribers and paid app subscribers.

105. FE 10 added that, "If Meredith asked Time to show where every subscription comes from, prior to the acquisition, Time would have been able to show Meredith that information because it was all housed in a proprietary Time system called Circulation Manager, or "Circ Manager." FE 10 explained that a large portion of his job was running reports from Circ Manager and that his group relied "heavily" on the system. FE 10 said that Time had several other subscription tracking systems, including at the fulfillment center in Tampa, Florida. These other systems were called "Magic," "Merlin," and "Cosmo." According to FE 10, Magic housed all customer information before it was fed into Circ Manager for single title orders, while Cosmo housed all customer information for multi-title or combination offer subscriptions. Cosmo also tracked orders from a subscriber like a hair salon, which selected multiple titles on a subscription form. These systems were sortable by title and detailed how each subscription was acquired, such as individually or in a combination deal or some other manner. FE 10 emphasized the granularity of the records that Time kept, saying, "The subscriber information we had included the term of the

[23] FE 10 was a Senior Manager, Consumer Marketing and Revenue at Meredith and legacy Time employee from before the Class Period until August 2018.

subscription and its price. The cornerstone of the whole business was tracking. Everything was measured, and we wouldn't not have this information."

106. FE 10 stated that Meredith had access to all of Time's subscriber information systems, including Circ Manager, because "Anything they needed we had to give them. We provided a lot of information because we were switching fulfillment systems and that was a big process." FE 10 said he and other legacy Time employees ran subscription reports for Meredith on a daily, weekly and monthly basis, and stated, "The long and short is that (Meredith) could have gotten that information from us. They got whatever information from us they wanted." FE 10 recalled that his superior "ran a lot of reports specifically for post-acquisition Meredith," especially during Meredith's shutdown of the Time fulfillment center in Tampa and the migration to Des Moines.

**c. The Alliance for Audited Media Tracked and Closely Audited the Details of Time's Low-Margin Subscriptions**

107. To reiterate, when Meredith disclosed shockingly increased costs tied to the Time integration on September 5, 2019, it claimed it was because "the number of low-margin magazine subscriptions we encountered inside the legacy Time Inc. brands were more than anticipated." But, this disclosure occurred 20 months after Meredith had acquired Time. Based on the importance of subscription data to Meredith and the Company's unobstructed access to it, Meredith understood the scope of legacy Time's low-margin subscriptions during the due diligence it performed in connection with Meredith's acquisition of Time and certainly during the subsequent 20 months between the acquisition and September 2019. This is supported by the fact that Time and Meredith shared specific, detailed subscription data with third-party subscription

auditing firm the Alliance for Audited Media ("AAM"),[24] and that AAM calculated and verified granular details about legacy Time brand subscriptions, including the precise Net Average Subscription Price per Copy of each brand, as well as the customer categories to which Meredith sold its subscriptions.

108. To calculate Meredith's net subscription prices, Meredith necessarily knew, throughout the Class Period, the remit rate on each agency subscription that was a part of the reported price per issue, and how many subscriptions to which it applied. Since AAM could compile and understand that data, Meredith also certainly understood that its actual margins on each of its titles remained consistently low throughout the Class Period. Meredith's claim to the contrary—that it only understood the number of low-margin subscriptions in September 2019—defies credulity.

109. By way of background concerning AAM's role in the industry, it is critically important that advertisers know that a given publisher's circulation numbers are accurate and reliable. To report reliable circulation numbers to advertisers, publishers work with outside audit firms to audit their reported subscription numbers. AAM is one of the most heavily-used outside auditors. More than 4,000 publishers, advertisers, agencies and technology vendors rely on data provided by AAM to ensure their transactions are based upon a verified subscriber base, and both Time and Meredith worked with AAM, supplied subscription data to AAM, and relied on AAM's audits to understand and report their subscription data.

[24] The Alliance for Audited Media was originally known as the Audit Bureau of Circulations ("ABC"). The Association of National Advertisers founded ABC in 1914 to ensure media transparency and foster trust between advertisers and media companies. ABC changed its name in 2012 to reflect the diversified businesses of its members, which had expanded from print media to include many other forms of media.

110. According to AAM, it "works with magazine media publishers to first verify distribution and then help promote [publishers'] data to potential buyers." AAM reviews not only the circulation levels claimed by publishers but also the sources of those circulations, the prices at which subscriptions are sold, renewal rates, and overall circulation composition.

111. The publishers themselves compile information regarding their subscriptions on so-called "Publisher's Statements" and submit them to AAM twice each year. At the conclusion of each Publisher's Statement, the submitting party certifies that the Publisher's Statement complies with AAM's bylaws and rules. Prior to Meredith's acquisition of Time, Time also partnered with AAM and used AAM Publisher's Statements.

112. A Publisher's Statement includes a section titled "Prices," which includes the Suggested Retail Price for an Average Single Copy, as well as the Net Average Subscription Price per Copy. For example, **Figure 1** below shows that the average suggested retail price of a single copy of *TIME* for the period ending June 30, 2016 was $5.99 (red box below). As for the Net Average Subscription Price per Copy during the same period, that price was only $0.59 (blue box below). The significant difference between the Suggested Retail Price per copy of *TIME* of $5.99 and the actual net average subscription price per copy of *TIME* of $0.59 would have indicated to Meredith that Time had significantly depressed the per copy price of *TIME* through low-margin agency sales. In addition, the net price per copy of $0.59 would have allowed Meredith to calculate the average margin on sales of *TIME*.

| PRICES | | | |
|---|---|---|---|
| | Suggested Retail Prices (1) | Average Price (2) | |
| | | Net | Gross (Optional) |
| Average Single Copy | $5.99 | | |
| Subscription | $49.00 | | |
| Average Subscription Price Annualized (3) | | $30.71 | |
| Average Subscription Price per Copy | | $0.59 | |

(1) For statement period

(2) Represents subscriptions for the 12 month period ended December 31, 2015

(3) Based on the following issue per year frequency: 52

**Figure 1.**

113. AAM's data included the specific average sales price of each legacy Time magazine, and Meredith knew based on such low average prices that the magazines were sold at low margins. Specifically, the AAM data for six of the Time legacy brands that Meredith did not sell off during the Class Period show that the average subscription price per copy of each one was consistently low before and during Meredith's ownership of the brands, except until the last reporting period of 2019, when the net average price per copy for three out of five of those titles actually declined. As **Figure 2** below shows, this meant that the extent of low-margin subscriptions within the legacy Time business was a consistent, knowable problem throughout the Class Period and in fact worsened by December 2019, as the average selling price of those three titles declined:




**Figure 2.**[25]

114. Meredith gave AAM granular details about the specific locations where its subscriptions were sold, including whether they were sold to individuals, hair salons or doctors' offices. As FE 11 [26] explained, low-margin subscriptions were typically sold by third-party companies to, for example, distribute magazines to doctors' offices, where a single subscription has a high reader-per-copy rate. FE 10 stated, "One category I worked on specifically was the verified business category, which was business Time Inc. paid for in doctors' offices, auto shops and other places of business with waiting rooms" and added that the AAM liaison at Time "had to look at the reporting a couple times per year to make sure Time understood the correct number of expected subscriptions in each AAM category."

115. AAM's Publishers' Statements broke down the types of public places and individuals that comprised the subscriptions in the "Verified" business category, in a section called

---

[25] Lead Plaintiff obtained the underlying non-public data in this graph from AAM audits of the legacy Time properties, through a process of discussions with AAM, the submission of an affidavit to AAM setting forth Lead Plaintiff's need for this information, and paying a fee.

[26] FE 11 was an Executive Director, Brand Marketing at *People/Entertainment Weekly* from before the Class Period until September 2018.

"Additional Analysis of Verified," as this example, **Figure 3**, from *TIME*'s 2016 Publisher's Statement shows:

| ADDITIONAL ANALYSIS OF VERIFIED | Print | Digital Issue | Total |
|---|---|---|---|
| **Public Place** | | | |
| Doctor/Health Care Providers | 157,325 | | 157,325 |
| Education/Learning Facilities | 945 | | 945 |
| Fitness/Recreational Facilities | 190 | | 190 |
| Personal Care Salons | 8,151 | | 8,151 |
| **Total Public Place** | **166,611** | | **166,611** |
| **Individual Use** | | | |
| Individually Requested | 1,205 | | 1,205 |
| Ordered/Payment Not Received | 10,344 | | 10,344 |
| Professionals | 991 | | 991 |
| **Total Individual Use** | **12,540** | | **12,540** |

**Figure 3.**

116. Time, Meredith and AAM were all able to report such granular subscription data only because Time and Meredith had the underlying information and the ability to compile and process it. Such details were known and knowable to Meredith from the very start of the Class Period.

117. Publishers like Meredith and Time also retain AAM to perform subscription and circulation audits of their brands. According to AAM, its audits "[e]nhance [a publisher's] market recognition and credibility among media buyers [i.e. advertisers] and present these buyers with "verified metrics [that] will attract leading brands, media buyers and technologists around the world." Accordingly, magazines include third-party circulation audit reports from AAM in the media kits that their sales teams provide to advertisers and agencies.

118. FE 1 stated that companies like AAM audit subscriber data of publishing companies, showing when the company obtained its subscribers, when subscriptions stop and how many drop off. The audits show the yearly outlook of a magazine's subscribers and where the magazine is growing or declining. If a subscriber audit shows that a magazine added 2 million subscribers year-over-year, one can then investigate if the publisher is offering inexpensive, $4

subscriptions to boost its subscriber numbers. The audit is performed completely by an outside audit company, and the publishing company pays a fee annually per title to have the auditor perform it. FE 1 stated that Meredith would have likely had access to Time's subscription audits.

119. Publishers have no room for exaggeration in their self-reported numbers in the Publisher's Statements because the publishers would risk that they would not receive a "clean" audit, which is an audit without significant deviation from traditional policies. A clean audit is essential to a publication's success. Failure to achieve a stated circulation volume or level directly impacts a magazine's relationship with its advertisers, who paid a certain price for advertising with the understanding that the magazine reached the claimed number of subscribers. If an audit revealed that a magazine had fewer than its reported subscribers in verified circulation, the advertiser would demand rebates or refunds, and potentially commence legal action, based upon the incorrect circulation figures.

120. Several former Time and Meredith employees recounted that AAM was closely involved with Time's and Meredith's low-margin agency subscription business. This supports that Time and Meredith knew in real-time the scope of the low-margin subscriptions at the legacy Time brands:

- FE 10 explained that, during his tenure at Time, he worked closely with AAM: "If agents had an idea for an offer, I would send the proposed offer to Time Inc.'s AAM liaisons, who would then send the details to AAM for AAM approval." Then, "the AAM liaison would make sure that AAM approved and that it was in the right AAM category." FE 10 said AAM needed to approve any new type of offer sent to agencies;

- FE 11 explained that low-margin subscriptions are "pretty easy to find simply by looking at Time's 'Pink Sheets,'" a publishing industry term for Publisher's Statements since they were at one time shaded pink; and

- FE 11 "can't imagine" that Meredith did not have access to Time's Pink Sheets because Meredith had "always been very careful about deals that involved low-margin subscriptions." FE 11 added, "If there is a lot of that going on you can fairly easily change your practices, so you don't have those low-margin subscriptions."

121. Several former employees also recounted that the information in the Publisher's Statements, and AAM's audits, were so fundamental to Time's business that Meredith almost certainly reviewed the details of Time's subscription data in them prior to the acquisition, as part of Meredith's due diligence of Time:

- FE 11 said that Meredith knew about the practice of low-margin magazine subscriptions, stating that Meredith had to know, or was at least provided with, the numbers on Time's low-margin subscriptions during due diligence to show how many low-margin subscriptions Time had for its publications;

- FE 1 stated that Meredith executives would have wanted to review the Time subscriber audits because Meredith would not purchase a company without evaluating it first, and Meredith would have wanted to see this information and not take Time's word for it. As FE 1 explained: "As an executive at a multi-billion-dollar company you're going to want them [the audits]";

- FE 1 also said that, following the acquisition, since "many magazines were eliminated right away or were rolled into other titles," "Meredith would have likely understood how many subscribers each publication had and what type of subscriptions they were." FE 1 further stated that Meredith would have known because of the titles' U.S.P.S. Statements;

- FE 1 added that, when Meredith was considering purchasing a magazine title, there was an internal Meredith team that performed all of the due diligence of investigating the title, from its subscriber numbers to its bank account, and Meredith would regularly supply this type of information to third parties if it were selling one of its own titles;

- FE 1 recalled seeing that Meredith had obtained this information from another publishing company (Rodale) that it had previously considered purchasing when it was considering buying it;

- Regarding low-margin subscriptions, FE 2 said it is "Magazine 101" for Meredith to have looked into and understood how many subscriptions Time's brands had and what percentage of those subscriptions were low-margin filler circulation; and

- FE 9 said, "It would be surprising for Meredith not to have known about Time's filler circulation because it likely engages in the same practice with its own publications. Meredith should have known better." FE 9 said, "A magazine's value is ultimately devalued by filler subscriptions," and understanding filler subscriptions "would be a matter of due diligence."

122. Thus, among the most important pieces of information that Meredith most certainly reviewed during its due diligence of each Time legacy brand were its Publisher's Statements and audits performed by AAM. By consulting these sources, Meredith immediately understood the scope of low-margin subscriptions at the legacy Time brands.

## V. THE TRUTH EMERGES

123. The truth was partially revealed when, on May 10, 2019, Meredith admitted that it would take longer than originally anticipated to achieve the claimed synergies from its acquisition of Time due to problems with the Time integration and weaknesses in Meredith's controls over financial reporting. Because Meredith had no ability to accurately measure Time's assets on its own and ran two separate, un-integrated systems of financial reporting—one system for Time's legacy lines of business and a different system for Meredith's lines of business—the Company was forced to retain Time's financial personnel in order to understand Time's assets.

124. In its Form 8-K, signed by Ceryanec, filed with the SEC on May 10, 2019, Meredith quoted Harty as stating: "[W]e believe it will take longer than originally anticipated to achieve the remainder of the synergies due to investment spending to grow the business; retaining certain employees longer than anticipated to ensure business continuity; and operating the Assets Held for Sale longer than expected. However we remain confident we will achieve our $550 million cost synergy goal by the end of fiscal 2020." That day, Defendant Ceryanec further disclosed on Meredith's investor call that "As we're integrating all of the back-office functions to make sure we do it right, we've held some people longer than we anticipated or initially with those more in the IT, accounting and finance areas to make sure we support the business. So those are really the costs." In response to this disclosure, on May 10, 2019, the price of Meredith stock declined by a statistically significant amount of $4.50, or ***7.5%***, from an opening price that day of $60.30 to a closing price of $55.80.

125. As a Citi analyst report published on May 10, 2019 stated, the "Synergy Attainment Pace [Was] Slower Than Previously Expected." The Citi analyst wrote that Meredith disclosed that it "expects to deliver $550 million net annual cost synergies by June 30, 2020 from the Time Inc. acquisition, but has modified the time-frame for achievement," which "resulted from retaining employees longer than anticipated to facilitate integration, and holding assets for sale longer than expected." As Citi wrote, "MDP [Meredith] has achieved $320 million synergies through March 31, 2019 and expects an additional $60 million in the June quarter and an incremental $170 million in fiscal 2020 (ending June 30, 2020)."

126. The truth was more fully revealed to the investing public on September 5, 2019 when Meredith shocked investors with the release of fiscal 2019 fourth quarter and full year financial results. Once again, due to Meredith's lack of internal controls and resulting inability to measure the value of Time's assets, Meredith was forced to admit its integration costs were much higher than previously represented. In its September 5, 2019 press release announcing the results, Meredith made the following disclosures:

- Harty admitted that it had "taken longer than we initially expected to elevate the print and digital performance of the Time Inc. assets," and that "comparable advertising performance lagged Meredith's expectations in the first half of fiscal 2019";

- "Meredith recorded $94 million of net after-tax special items in fiscal 2019, primarily related to restructuring and integration costs related to the Time Inc. acquisition";

- "Looking more closely at fiscal 2019 fourth quarter results compared to the prior-year period: . . . Loss from continuing operations was $4 million, or $0.51 per share, including $62 million of net after-tax special items, primarily related to restructuring and integration costs";

- Harty said, "[W]e begin fiscal 2020 at a lower profit point than originally expected. In addition, we are planning strategic investments to further strengthen our performance and maximize shareholder value over time. Both of these factors contribute to a reset of our financial expectations in the outlook we're providing"; and

- "for full-year fiscal 2020, Meredith expects:…Adjusted EBITDA to range from $640 million to $675 million, and adjusted earnings per share to range from $5.75 to $6.20. This includes approximately $50 million of planned strategic investments."

127. On the September 5, 2019 investor conference call accompanying Meredith's release of its fiscal fourth quarter and full year 2019 results, Harty purported to explain what drove Meredith to significantly underperform the guidance it had previously provided to its investors:

> [W]e acknowledge the challenges we faced that resulted in a reset of EBITDA expectations for fiscal 2019 and going forward. Foremost, it took longer than expected to turn around advertising performance with the legacy Time Inc. brands.
>
> Additionally, the number of low-margin magazine subscriptions we encountered inside the legacy Time Inc. brands were more than anticipated. Both issues required additional investment spending and impacted our EBITDA generation. Once recognized, we tackled these issues head on and we are confident in the plan and the approach we're taking in fiscal 2020 and beyond. As a result, we began fiscal 2020 at a lower profit point than originally expected which contributes significantly to the outlook we're providing.

128. Following Harty, Defendant Ceryanec announced a scaled-back outlook and guidance for full-year fiscal 2020, a far cry from the $1 billion in EBITDA Meredith had previously extolled as an inevitable result of its integration of the Time assets, which remained incomplete:

> Now turning to our outlook for full fiscal 2020. We expect total company revenues to range from $3 billion to $3.2 billion. Earnings from continuing operations to range from $197 million to $212 million and from $2.58 to $2.88 on a per share basis. These amounts do not include special items and our actual results may include special items that have not yet occurred and are difficult to predict with reasonable certainty. We expect full fiscal 2020 adjusted EBITDA to range from $640 million to $675 million and adjusted earnings per share to range from $5.75 to $6.20.
>
> As Tom mentioned, while we've accomplished many of the acquisition-related goals that we set for ourselves[,] [w]e acknowledge that we are not where we thought we would be at this point in time. As a result, we're resetting the EBITDA expectations for fiscal '20 and going forward. Now this outlook is informed by the factors that Tom mentioned, but it's also informed by the completion of a rigorous budgeting process for fiscal '20 that's based on the results we've delivered since acquiring the Time brands and businesses 19 months ago.

129. In addition to admitting that Meredith and its executives were wrong about their ability to integrate Time's assets on a short timeframe – i.e., to "hit the ground running" – Ceryanec confirmed that, based upon outside verification, Meredith would not attain the more than $500 million in synergies during the original timeframe it had promised to investors, as a result of the Time acquisition:

> [F]ollowing the change in guidance that we communicated on our last earnings call in May, we engaged outside support to: one, verify the cost synergies we originally identified and determined that we had achieved them; two, help us identify additional cost synergies; and three, assist with the development of a zero-based budget. As a result of this work, we can confirm that we achieved $430 million of synergies through fiscal 2019, which is actually more than we had originally expected, but which somewhat reduces our 2020 expectations.

130. Finally, Ceryanec issued comments on Meredith's 2020 budget outlook, revealing further misrepresentations by Meredith in connection with the Time acquisition's benefits and purported synergies:

> On the National Media Group, we have more moving parts [than the Local Media Group]. On the plus side, we expect to deliver an incremental $135 million of synergies in fiscal 2020. We also expect growth in digital ad revenues. We expect print ad revenues to decline in the mid-single digit range in line with Meredith's industry-best historic levels. We expect lower contribution from consumer-related revenues due primarily to the lower-margin subscribers we acquired with the legacy Time Inc. brands, and we also expect higher production and distribution expenses, including an expected post rate increase.

131. Indeed, Meredith finally admitted that it was aware throughout the Class Period that the Time assets were significantly underperforming the results and expectations that the Company was issuing to its investors and that the Company was trying to compensate by committing additional investment spending to elevate their performance. Indeed, analysts expressed confusion over how the September 2019 disclosures were directly at odds with Meredith's prior public statements and claims of optimism. For instance, Kyle Evans, an analyst from Stephens, said, "I think we're all probably scratching our heads trying to reconcile what looks

like a pretty conservative adjusted EBITDA guide with some kind of optimistic trends especially on legacy print Time side." Evans asked, "Could you put some brackets around the impact of the higher production and distribution expenses and your efforts to fix those lower Time subscription margin problems?" With respect to reconciling EBITDA trends, Ceryanec said:

> [A]s we look at reconciling the National EBITDA, if we take 2019 of $456 million that we delivered, obviously we said we've got synergies positive of $135 million. We expect digital to contribute kind of mid-teens EBITDA. Obviously with print down mid-single digits, that's about a $25 million drag. As we mentioned, the investments are about $50 million. On the lower margin consumer revenue, that's about a $20 million reduction year-over-year and then the remaining is a series of expenses. That includes compensation adjustments, it includes the postal increase and it includes some expectations on higher paper and production expenses. That's about $20 million.

132. Harty then responded to Evans regarding Meredith's efforts to "fix" the low-margin subscriptions. He said, "<u>[W]e dug into Time Inc.</u>, obviously in the last year and they had significantly pulled back on their investment in what we would call direct to publisher subscriptions." Harty continued, "[W]hen they were in a cash crunch, <u>[Time] went to what I would say less profitable longer-term subs and pulled back on that investment in the range of about $20 million a couple of years ago</u>." Then, having declared that Meredith identified the problem at Time with respect to low-margin subscriptions, Harty declared, "<u>[W]e've made some investments last year</u>, and we continue to move forward to make some additional investments in what we would call direct to publisher subscriptions <u>to improve profitability subs longer term</u>."

133. Jason Bazinet, an analyst from Citigroup, also addressed Defendants, saying, "[A]ll of the legacy National Media Group EBITDA, <u>all of the legacy Time EBITDA has just sort of disappeared</u>." He added, "<u>I don't understand this guidance at all</u> . . . seems like there's a $0.5 billion question." Harty responded, "<u>[W]e acknowledge that our guidance for '20 is below our expectation – below the Street's expectation</u>. . . I just want to address the reason why we did this acquisition . . . We [] wanted to create financial scale and financial diversification." Harty then

admitted what Defendants had in fact known for a long while, stating, "[T]he patient was a little sicker than we expected when we acquired it and we've kind of outlined that, the advertising piece of it was a lot worse than we expected . . . [T]he base of [Time's print] advertising business is much lower than what we had expected at the acquisition."

134. The price of Meredith's stock collapsed in response to these disclosures. Meredith's stock price closed on September 5, 2019, at $33.68 per share, down more than 20% in one day on extremely high trading volume of over 5.6 million shares, and more than 50% from its closing price when the Company announced that it had acquired Time.

135. After Meredith's release of its fiscal 2019 fourth quarter and full year financial results, also on September 5, 2019, Wolfe Research issued a report stating that "The F'20 EBITDA guide missed big — we think it is all National [Media Group, Meredith's print media division]."

136. Following the September 5, 2019 investor call, Stephens wrote that Meredith's announcement left "analysts/investors struggling to reconcile expected total cost synergies of $565 [million]," and wrote that the release of financial results means "MDP [Meredith] will be in the penalty box until the street has very clear proof of much execution in the [National Media Group] business."

137. That same day, Wolfe Research published a scathing note in response to Meredith's fiscal fourth quarter and full year 2019 financial results. Writing that the stock is "cheap for a reason" and advising "investors should remain on the sidelines until we get a clear line of sight into EBITDA growth," Wolfe added that "MDP's performance today can objectively be characterized as a disaster." The Wolfe analysts also said that most of the $400 million in earnings the Company was expecting "just…poof! disappeared," as cited in a *Bloomberg* article on September 5, 2019. Wolfe summed up the drivers of Meredith's dismal performance: "All of this

is due to T[ime] as pre-T[ime], MDP had been one of the best performers of our [Wolfe TV Index] due to its low leverage and high dividend yield."

138. Following Meredith's disastrous September 5, 2019 earnings call, negative news reports reflected the market's shock over Meredith's disclosures. *The New York Post* reported on September 5, 2019 that "A rocky integration of Time Inc. titles . . . and lowered expectations for the year ahead had Wall Street turning negative on Meredith Corp." Less than two weeks later, on September 18, 2019, S&P Global Ratings revised its outlook on Meredith downward.

139. Analysts continued to express surprise and disapproval with Meredith's September 5, 2019 earnings report. On September 12, 2019, Benchmark published a report lowering its price target for Meredith. The Benchmark analysts characterized Meredith's fiscal 2020 guidance as "disastrous" and wrote that "[Meredith] management overestimated their ability to improve T[ime]'s print declines out of the gate" and declared, "The next two fiscal years are going to be messy." Specifically, Benchmark wrote that, with respect to addressing the low-margin subscriptions, the "the circ gross-up will create optical illusions near-term and tougher comps as the shift to direct [subscriptions] plays out."

140. On September 12, 2019, Benchmark further reported on how the Company's September 5, 2019 disclosures had created "lingering confusion" over how Meredith's prior $1 billion EBITDA guidance for fiscal 2020 was revised so heavily downward to $660 million. As the analyst wrote:

> How to get from A to C – There continues to be lingering confusion over how a $1 billion initial EBITDA guide ended up at $660 million in FY20. The first step seems fairly straightforward; management overestimated their ability to improve T[ime]'s print declines out of the gate while digital revenue dropped to flat growth y/y. Assuming management anticipated a low-single digit q/q improvement in T[ime] print trends vs. the reported further deterioration, and at least mid-single digit growth in digital, we can account for nearly all of the drop from the initial $1 billion outlook to the prior consensus $800 million level. Add in $50 million of

> strategic initiatives to shift customers from agency to direct. ASC606 magically vanished another $30 million. That leaves a $60 million delta. Part of the remainder relates to the gross up in no-margin agency circulation that was originally calculated as higher margin ad dollars, while another part reflects a longer period of time anticipated to shift a portion of the circ base from agency to direct, along with a higher cost base to do so and a lower success rate outlook. . . . The next two fiscal years are going to be messy.

141. On September 17, 2019, Zacks analysts downgraded Meredith's stock from "neutral" to "underperform" and issued a "strong sell" rating. Among other reasons for the downgrade, Zacks analysts cited Meredith's "dismal stock performance," "disappointing FY20 view," and "soft advertising revenue." Specifically with respect to advertising, Zacks analysts wrote, "Advertising (roughly 53% of FY19 total revenue) remains an important source of revenue and any softness in this category is likely to hurt the company's overall revenues." Zacks analysts maintained their "underperform" and "strong sell" ratings in their next report on October 21, 2019.

142. The October 2019 Zacks report reiterated the same concerns the analysts noted in September 2019. Zacks also reported that:

> Shares of Meredith have slid and lagged the industry in the past three months. The stock got hit following fourth-quarter fiscal 2019 results, wherein revenues fell year over year. Also, management's commentary of commencing fiscal 2020 at a lower profit point than initially expected and soft adjusted earnings view for fiscal year added to woes. Industry experts pointed that Time Inc. buyout is not generating desirable results. Looking into fiscal 2020, Meredith expects lower contribution from consumer related revenues at National Media Group due to low-margin magazine subscriptions inside the legacy Time Inc. brands.

143. The truth was more fully revealed to investors on October 1, 2019, when Meredith announced the sudden retirement of Defendant Ceryanec from his position as Meredith's CFO. The press release announcing the departure stated that "Ceryanec has agreed to stay in his role for a transition period through early calendar year 2020 while Meredith conducts a national search for his successor." In response to this news, which was announced mid-day on October 1, 2019, Meredith's stock price declined $0.51 on October 1, 2019, then continued its decline on October

2, 2019, resulting in a statistically significant decline of $2.06 of 5.6% on October 2, 2019 on above-average trading volume of more than 1 million shares, as the market continued to digest the news of Ceryanec's departure.

144. When Defendant Ceryanec's retirement was announced, he was 58 years old. With Meredith's mandatory retirement age set at 65, his departure was not tied to mandatory retirement. Instead, the market tied his retirement to Meredith's failed integration with Time. On October 2, 2019, the *Des Moines Register* reported:

> As chief financial officer since October 2008, Ceryanec has helped negotiate major acquisitions by the company, including its $2.8 billion purchase of Time, Inc. last year. . . . Ceryanec's retirement comes as Meredith has struggled to implement its Time, Inc. purchases. During a conference call [on September 5, 2019], he projected the company would earn $30-$65 million less in Fiscal Year 2020 than it did in 2019. "We are not where we thought we would be at this point," Ceryanec said at the time. The company's stock dropped 23% after the call.

## VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

145. Numerous allegations set forth above and summarized below give rise to the strong inference that Defendants knowingly or recklessly misled investors about the failed integration of, and performance of, Time's assets, the strength of Meredith's internal controls over its financial reporting, and the necessary costs to remedy these problems.

146. First, Defendant Ceryanec was a member of Meredith's Integration Steering Committee and learned from status reports flagged "Red" that the integration was failing. Specifically, Defendant Ceryanec learned that the critically important integration of Time's PeopleSoft platform with Meredith's Oracle platform was failing and stalled. As a member of the Steering Committee, Ceryanec received at least two reports that had been flagged "Red," one in August 2018 and a second in December 2018. These "Red" reports showed serious concerns about Meredith's ability to meet the internal deadlines Defendants had set for the integration, which were exceedingly aggressive. Ceryanec also received the original integration plan, and any changes and

updates to it, that set completion of the Oracle-PeopleSoft integration for February 28, 2019. Meredith failed to meet this deadline, which was contrary to Meredith's public claim that its finance and IT functions were integrated as of February 11, 2019.

147. Second, according to the SOX certifications that Defendants Harty and Ceryanec signed during the Class Period, Defendants investigated Meredith's internal controls and certified their accuracy on many occasions and were at, a minimum, severely reckless when they signed the certifications. These certifications included the following language:

- [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and

- [T]he financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations, and cash flows of the registrant."

148. Specifically, with respect to internal controls, Defendants certified that they had themselves:

- Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

- Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

- Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)

> that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

149. Finally, in the SOX certifications, Defendants attested that they informed their auditor and the audit committee of the Board of Directors of:

> - All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information.

150. Given the dire state of Meredith's internal controls over financial reporting, including of the Time assets, these false representations in Meredith's SOX Certifications were made by Defendants with severe recklessness at a minimum.

151. Third, Defendants' claims after Meredith internally recognized on March 31, 2019 that it had material weaknesses in its internal controls to assess the value of the Time assets were particularly knowingly false and severely reckless when made because the admission of the internal control deficiencies specifically put Defendants on notice of the likelihood that serious valuation problems existed with the legacy Time properties. Despite this, from April 5, 2019 through September 5, 2019, Defendants made repeated claims about the financial strength of the legacy Time properties, including Defendant Harty's announcement during the May 10, 2019 investor call that "[w]hile it took longer than we initially expected to turn around advertising performance around at legacy Time brands, they are now in-line with Meredith's historical and expected long-term performance," as well as Defendant Werther's statement on the same call that "[l]egacy Meredith brands have been performing consistently, and the improvement we delivered in our fiscal third quarter was driven primarily by the acquired Time Inc. brands."

152. Fourth, Defendant Harty's claim, for instance, that Meredith had "fully integrated our HR, finance, legal and IT functions" as of February 11, 2019, was either knowingly false or made with severe recklessness of the underlying facts because, as set forth above, during the Class

Period: (i) Meredith and Time finance platforms worked in parallel after Meredith realized it could not integrate the Time functions into Meredith's ERP just a few months after the acquisition; (ii) Meredith did not fully integrate the Time IT and finance functions until August 2019; (iii) Meredith operated with several separate financial books, including separate Time and Meredith financial systems, had wholly inadequate audits from junior-level KPMG auditors, and admitted to material weaknesses in its internal controls over financial reporting concerning the value of the Time assets. The lack of full integration of Time and Meredith's financial functions is also further supported by Meredith's admissions, on May 10, 2019 and September 5, 2019, that the Company needed to retain Time financial personnel to help with the integration and accrued increased expenses associated with that retention, which FE 4 said was far from complete in January 2019. According to FE 4 and FE 8, Defendants knew they would need to retain these employees months before their own departures from Meredith in January 2019, when the difficulties merging the two companies' systems were clear.

153. Fifth, Meredith understood, and as CFO Ceryanec would have known, that Meredith and Time's financial platforms operated in parallel during the Class Period, rather than being integrated. Ceryanec was also aware of the need to retain legacy Time employees for a longer duration than Meredith had originally planned because of the failed integration because he would have needed to approve and account for the employees' continued salaries and benefits.

154. Sixth, Meredith's integration of Time was a central focus of the Company, Executive Defendants, analysts, and investors throughout the Class Period, and Defendants spoke about the integration on numerous occasions and repeatedly made false and misleading statements about its purported progress.

155. Seventh, Meredith engaged in a process to acquire Time or Time's assets on at least two prior occasions and, as a result, through numerous rounds of investigation and due diligence, gained significant insight into the strengths and weaknesses of Time's underlying business, including weaknesses in its subscription base. Meredith first approached Time about purchasing its assets in 2013, and those negotiations fell apart due to Meredith's insistence on excluding *TIME*, *Sports Illustrated*, *Fortune*, and *Money* magazines from any transaction. Then, in early 2017, Meredith approached Time again but was unable to secure adequate financing to close the deal. Only on its third attempt, after it secured a $650 million cash infusion from KED, in late November 2017, was Meredith able to finally buy Time, including the quartet of magazines that it had originally refused to purchase in 2013.

156. Prior to the closing of its purchase of Time, Meredith performed extensive due diligence of Time and its assets, and Defendants became aware of the relative strengths and weaknesses of its business. As Meredith disclosed in its November 27, 2017 Form 8-K announcing Meredith's acquisition of Time: "[Time] shall, and shall cause its Subsidiaries to, and use reasonable best efforts to cause its and [Time's] Subsidiaries to provide [Meredith] such cooperation in connection with the [transaction] including . . . (i) . . . due diligence sessions (including accounting due diligence sessions)."

157. Defendants also repeatedly emphasized how much time and effort they spent, over the course of several years, evaluating Time and its assets. For example, during Meredith's May 10, 2018 conference call with investors, Defendant Ceryanec expressed confidence in the synergy figure of then-$500 million, saying, "I would say that when we did our initial synergy range that was based on diligence work, as we expected, once we got into the procurement operations, and we started looking at really combining on a detailed basis. We feel a lot more comfortable [beyond

$500 million]." Similarly, during the same May 10, 2018 call, Ceryanec remarked that the four titles held for sale benefited the combined Meredith and Time because "stripping those out really allows the remaining business to carry a higher margin." Likewise, at the Deutsche Bank 26th Annual Leveraged Finance Conference in Scottsdale, Arizona on October 3, 2018, Harty emphasized that Defendants were confident in their understanding of Time's business because "We've actually . . . this was our – we were at [this] 5 years. This is our third attempt to get Time, Inc. We spent an enormous amount of time on diligence over the years on it . . . So I feel very, very confident about the synergy total."

158. According to former employees, the due diligence would have provided Meredith with insight into many aspects of Time's business, including "filler circulation" and low-margin subscriptions. As FE 9 said, it would be a matter of due diligence to know how many filler subscriptions existed within Time's titles. The due diligence process also would have provided details and insight into Time's accounting and audit procedures, and the need for Meredith to retain Time personnel and upgrade Meredith's finance structure and processes and procedures. As FE 12[27] explained, merger due diligence is designed to avoid deficiencies related to internal controls over the processes to establish the fair value of certain assets and liabilities.

159. Eighth, as early as January 31, 2018 – the day Meredith announced the Time acquisition had been finalized and the first day of the Class Period – Defendants spoke about their awareness of so-called low-margin subscriptions at Time and their commitment to "bring the advertising and circulation performance of the acquired Time Inc. properties to at least industry norms" (i.e., improve low margin subscriptions). Just over three months after the acquisition, on

[27] FE 12 was a Director of Operations Global Real Estate at Meredith from before the Class Period until August 2018.

May 10, 2018, Defendants announced that they had launched a "large-scale initiative" to "increase circulation revenue and lower subscription acquisition cost."

160. In Meredith's 2018 Form 10-K, filed with the SEC on September 4, 2018 and signed by Defendants Ceryanec, Harty, and Lacy, the Company admitted that Meredith was already focused on reducing the number of "agent"-based, low-margin subscriptions. Defendants stated that Meredith's "subscription revenues decline was also partially due to ongoing efforts to source a larger percentage of magazine subscribers from Meredith's own database instead of external agent sources."

161. During Meredith's May 10, 2019 investor call, Defendant Harty directly raised low-margin subscriptions and Meredith's actions to address them, saying:

> We're [] investing in more profitable sources of subscription acquisition, particularly because we've inherited some low-margin, agent-sourced subscriptions from the acquisition of Time Inc. As we have with our prior acquisitions, we're in the process of transitioning those to more profitable sources, but that takes time as the opportunity for margin improvement happens when they renew.

162. During the May 10, 2019 conference call with investors, both Defendants Harty and Ceryanec spoke about low-margin subscriptions in response to a question from a Benchmark analyst, who asked for "housekeeping on the synergy delay" so that "we have a sense of timing on [those]." Harty responded, "A lot of the expense investment has been on the subscription side and around, as we mentioned, acquiring more profitable subscriptions and swapping out lower-margin source subs that we had from Time Inc." Similarly, Ceryanec said, "[W]e've inherited brands that have a larger mix of low to little margin customers and it does take us some time and investment to move those customers over to a more profitable platform." Yet, despite acknowledging this awareness, Defendants still declared victory on May 10, 2019, on achieving Meredith's goals for integrating the Time assets.

163. Additionally, long before Meredith's September 5, 2019 disclosure, Defendants were aware of the amount of low-margin subscriptions at Time because all of the legacy Time publication 12-month subscriptions had already renewed under Meredith's ownership owing to the twelve-month anniversary of Meredith's acquisition of Time Inc. occurring three quarters earlier, on January 31, 2019.

164. Ninth, according to FE 1 and FE 11, magazine titles go through annual audits performed by the AAM, or other third-party subscription verification auditors. As discussed above, publishing companies like Time and Meredith retain AAM to conduct annual audits of their individual brands to provide information to advertisers and others who are interested in examining the state of a brand's subscriptions. These audits act as an independent check against the accuracy of the twice-yearly submissions of Publisher's Statements for magazines submitted by their publisher to AAM. AAM Audit Reports include breakdowns of subscription recipients into categories such as doctors' officers, salons, and individuals. They also contain net average subscription sales prices and projections for the yearly outlook for a brand and whether it is experiencing growth or decline. Given that Meredith pursued Time on no fewer than three occasions since 2013 – for over five years as noted by Defendant Harty – the AAM audit reports and Publisher's Statements for Time's brands would have been presented to, or requested by, the Meredith due diligence teams exploring the feasibility of the transaction and Meredith had direct access to all such legacy Time reports and audits after the acquisition. Former employees confirmed the significance of AAM materials and the critical importance of their accuracy for a publisher's business:

- FE 1: "These [AAM] audits include data regarding when subscriptions start and stop, how many subscriptions there are, and how much revenue the title generated";

- FE 1: "The executive team at Meredith would have looked at Time's AAM audits because I saw they had all that information when they were looking at Rodale. An executive from a multibillion dollar [publishing] company is going to want those audits";

- FE 1: "They had all the information [about Time], they're not stupid . . . they don't buy anyone unless they know everything and all the dirty laundry";

- FE 11: "Meredith was always very careful – advertisers cared about subscription data and all the information advertisers needed was on the Pink Sheets,[28] which measure how many subscribers a brand has to stay above the rate base, which is used as proof for advertisers that the title will be seen but an audience of a specific size. Even if Time did not offer their AAM audits on Pink Sheets directly to Meredith, Meredith would have been able to obtain them from AAM";

- FE 11: "AAM audits break down subscriptions types, including what are known as 'sponsored copies' or 'bulk issues,' which could otherwise be known as the low-margin subscriptions that are sent to destinations like doctors' offices, where the high number of readers per issue commands higher advertising rates but the price paid per subscription is low";[29] and

- FE 11: "I couldn't imagine that Meredith would not have reviewed Time's AAM audits and Pink Sheets in connection with the acquisition."

165. Tenth, there was no delay in Defendants physically gaining access to Time's underlying documents and personnel. Indeed, on January 30, 2018, Meredith rushed to remove the existing Time signage on Time's Manhattan headquarters and replaced it with a "Meredith" sign on the eve of the deal's close. Meredith executives, including Defendants Lacy and Harty, also arrived at Time's former headquarters the morning that the deal closed, and Harty established an office in the space occupied just one day earlier by former Time CEO, Rich Battista.

166. Eleventh, from the time the acquisition was finalized on January 31, 2018, Defendants have stated on numerous occasions that that they were "laser-focused" on their goal of

[28] Publisher's Statements are commonly known in the magazine publishing industry as "Pink Sheets," the color they used to be in the 1980s.
[29] These types of subscriptions are categorized as "Verified Subscriptions" in the Publisher's Statements.

integrating Time within the first two years after the acquisition. For instance, during Meredith's January 31, 2018 conference call, Defendant Harty said, "We are laser-focused on [achieving up to $500 million] of annual cost synergies and we will bring to bear the cost discipline you've come to expect from Meredith." Harty repeated the same statement on Meredith's next investor call on May 10, 2018. At the Deutsche Bank Leveraged Finance Conference on October 3, 2018, Harty again said Defendants were "laser-focused" on their cost synergy goal and raised it to $550 million. He repeated this same $550 million cost synergy claim at the UBS Global Media and Communications Conference two months later on December 4, 2018. During the May 10, 2019 conference call with investors, Harty claimed, "[W]e have been laser-focused on our plan to integrate the Time Inc. acquisition." Finally, on September 5, 2019, over nineteen months after the Time acquisition was announced, Harty insisted twice that Defendants were "laser-focused" on the integration. He told investors, "[W]e've been laser-focused on integrating what we believe is the best portfolio of National Media brands in the industry," and declared, "We've been laser-focused on the integration of Time Inc., which, obviously, was the biggest acquisition in the Company's history."

167. Twelfth, founded in 1902 as a magazine publisher, Meredith has been working in the print media space for 118 years and publishing has always been Meredith's core operation. Prior to the Time acquisition, Meredith had operated dozens of magazines for decades and was therefore familiar with how to operate print media. Throughout the Class Period, Defendants also touted the success of Meredith's prior integration of acquired entities. Given its long history, Meredith knew the details and data required to assess a print media asset and how to apply that knowledge to its assessment of its purchase of Time. Indeed, Defendants repeatedly claimed throughout the Class Period that they had actually assessed the state of Time's business, which

Harty conceded had transpired for five years, and had already implemented Meredith's own processes for print media in order to bring the Time business up to speed.

168. Beginning with the January 31, 2018 conference call announcing the finalization of the Time acquisition through the disastrous conference call on September 5, 2019, Defendants repeated verbatim, or a slight variation thereof, no fewer than sixteen times Meredith's stated goal to "[i]mplement Meredith's strategies, standards and discipline across the portfolio."[30] Defendant Harty has not uttered the "Meredith's strategies, standards and discipline" phrase since September 5, 2019.

169. Not only did Defendant Harty use this phrase during conference calls and investor conferences, but Defendant Meredith used it in several press releases during the Class Period.[31] No Meredith press release has included the "Meredith's strategies, standards and discipline" phrase since September 5, 2019.

170. <u>Thirteenth</u>, during the Class Period, Meredith experienced several high-profile executive reshufflings and departures of high-ranking executives deeply enmeshed with the Time acquisition and the failure to integrate Time into the Company. First, on January 15, 2019, Meredith abruptly announced that Defendant Lacy would be stepping down as Executive

---

[30] Defendant Harty used this phrase on the following occasions: the January 31, 2018 conference call with investors; the May 10, 2018 conference call with investors; the August 10, 2018 conference call with investors; the October 3, 2018 Deutsche Bank Leverage Finance Conference; the November 7, 2018 conference call with investors; the February 11, 2019 conference call with investors; the March 11, 2019 Deutsche Bank Media and Telecom Conference; the May 10, 2019 conference call with investors; and the September 5, 2019 conference call with investors.

[31] These press releases include: the May 10, 2018 press release related to fiscal 2018 third quarter earnings; the August 10, 2018 press release related to fiscal 2018 fourth quarter and full year earnings; the November 7, 2018 press related to fiscal 2019 first quarter earnings; the February 11, 2019 press release related to fiscal 2019 second quarter earnings; the May 10, 2019 press release related to fiscal 2019 third quarter earnings; and the September 5, 2019 press release related to the fiscal 2019 fourth quarter and full year earnings.

Chairman of the Board effective March 31, 2019, though he would remain in that position in a non-executive capacity, a post he continues to hold as of March 9, 2020.

171. Next, by no later than March 19, 2019, Meredith planned to terminate Defendant Werther, who was President of Meredith's National Media Group and led the Company's division with primary responsibility for the print media business. Two days later, the Company filed an amendment to Werther's employment agreement, on a Form 8-K signed by John Zieser,[32] that extended the time period for Werther to receive paid severance from 12 months to 18 months and provided that all awards of restricted stock units and stock options would automatically vest and that Werther's stock options would be exercisable for the full unexpired term of the option. Then, less than two months later, during Meredith's May 10, 2019 conference call with investors, Werther made a series of materially false and misleading statements to investors that declared victory on Meredith's efforts to integrate Time print publications into the Company. Werther claimed:

> [W]e said we would improve the print advertising performance of the acquired Time Inc. properties to Meredith's historic levels over time and we did. To accomplish this, we executed 3 key initiatives. First, we reorganized the way these brands went to market and implemented Meredith's sales and operating strategies, standards and disciplines across the portfolio; second, we invested in sales and marketing resources and activities; and third, we aggressively marketed the new portfolio, resulting in increased access to new advertising and marketing budgets.
>
> As a result, third quarter comparable year-over-year print advertising revenue performance improved significantly and is in line with the performance we expect. Legacy Meredith brands have been performing consistently and the improvement we delivered in our fiscal third quarter was driven primarily by the acquired Time Inc. brands.
>
> As we look into the fourth quarter, we anticipate further improvement driven again by many of the acquired brands, some of which look to be up in print advertising year-over-year. . .

[32] John Zieser is the Chief Development Officer and General Counsel of Meredith, having served in that capacity since before the beginning of the Class Period.

> Looking into the fourth quarter, we anticipate further year-over-year revenue and margin improvement.

172. Exactly one month later, on June 10, 2019, Meredith announced in a late-night press release at 10:26 p.m. ET that Werther would be leaving the Company immediately. The termination of Werther, after disclosures of the internal control weaknesses at Meredith, and following his false claims about the purported success of the integration of the Time properties, raise a strong inference that Werther was aware of, involved with, or recklessly disregarded the undisclosed problems Meredith was experiencing with the legacy Time properties.

173. Furthermore, the quick reversal between Werther's declaration of victory on the integration of Time's assets during the May 10, 2019 conference call and the disclosure of Meredith's disastrous financial results and guidance on September 5, 2019, indicate that Werther's statements were, at a minimum, severely reckless when made and concealed the true state of the integration of Time's assets and Defendants' knowledge that those assets were filled with low-margin subscriptions.

174. Finally, on October 1, 2019, Meredith announced the impending departure of Defendant Ceryanec as the Company's CFO, less than a month after Meredith's devastating earnings announcement on September 5, 2019. This announcement was a surprise to the market and at least one press report tied his departure to failures in the Time acquisition and integration. Meredith announced Ceryanec's departure at the age of 58, seven years before the Meredith mandatory retirement age of 65, and it followed on the heels of several disclosures of Meredith's material weaknesses in internal controls.

175. Fourteenth, Defendants were incentivized to misstate the synergies from the Time acquisition, Meredith's preparedness for the Time integration, and the purported lack of material weaknesses in Meredith's internal controls over financial reporting, in connection with Meredith's

purchase of Time because they received an increase in compensation in connection with the Time acquisition. In fact, from fiscal year 2017 to fiscal year 2018, Defendants Lacy, Harty, and Ceryanec's personal total compensation increased from $10,118,433 to $13,725,050 (Lacy), from $5,112,695 to $7,001,400 (Harty), and from $3,080,133 to $4,447,597 (Ceryanec). Furthermore, Defendants Lacy, Harty, and Ceryanec each received a generous award of stock options on February 2, 2018 that the Company described as a "special one-time grant for being instrumental in executing the Time Inc. acquisition." This award of stock options resulted in Defendants Lacy, Harty, and Ceryanec collectively receiving 220,500 more stock options in fiscal 2018 compared to fiscal 2017. This was an approximate 170.3% increase in the number of stock options awarded to Defendants Lacy, Harty, and Ceryanec, and carried a value of $3,306,319 based on the options' exercise prices.

176. Additionally, Defendants' salaries increased as the Time acquisition progressed. First, between fiscal 2017 and fiscal 2018, every Defendants except for Lacy received an increase in salary. As reported in Meredith's 2018 Definitive Proxy Statement, which was filed with the SEC on September 24, 2018, Meredith increased the salaries of the following executives:

| NEO | Fiscal 2017 ($) | Fiscal 2018 ($) | Change (%) |
|---|---|---|---|
| Stephen M. Lacy | 1,000,000 | 850,000 | (15)% |
| Thomas H. Harty | 800,000 | 900,000 | 13% |
| Joseph H. Ceryanec | 650,000 | 685,000 | 5% |
| Paul A. Karpowicz | 750,000 | 750,000 | —% |
| Jonathan B. Werther | 600,000 | 685,000 | 14% |
| John S. Zieser | 685,000 | 685,000 | —% |

Next, Defendants, with the exception of Lacy (because he stepped back from his active role in Company leadership), received another double-digit percentage raise from fiscal 2018 to fiscal 2019, as Meredith revised the "Peer Group" used to set its Executive Compensation. Specifically, according to the 2019 Definitive Proxy Statement, filed with the SEC on September 27, 2019, "[b]ased on the Committee's review of the benchmarking analysis, an evaluation of the larger

scope and complexity of many of the executives' roles in connection with the acquisition of Time Inc., and performance," the Company set the following increased salaries:

| Executive | Fiscal 2018 ($) | Fiscal 2019 ($) | Change (%) |
|---|---|---|---|
| Stephen M. Lacy | 850,000 | 850,000 | — % |
| Thomas H. Harty | 900,000 | 1,000,000 | 11 % |
| Joseph H. Ceryanec | 685,000 | 750,000 | 10 % |
| Patrick J. McCreery | 425,000 | 525,000 | 24 % |
| Jonathan B. Werther | 685,000 | 750,000 | 10 % |
| John S. Zieser | 685,000 | 750,000 | 10 % |

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

177. During the Class Period, Defendants made a series of materially false and misleading statements and omissions during Meredith's conference calls with investors, at investor conferences, and in the Company's SEC filings and press releases. Defendants' false and misleading statements and omissions generally fall into three categories: (1) misleading statements and omissions about the supposed adequacy and integrity of Meredith's internal controls; (2) misleading statements and omissions concerning the Company's purported plan to "hit the ground running" after the Time acquisition, its failure to integrate the Meredith and Time businesses, and its failure to disclose the true cost of reducing low-margin subscriptions and the omission of the significant costs required to complete the integrations; and (3) misleading statements and omissions concerning Meredith's claimed synergies from the Time acquisition and its ability to earn $1 billion in EBITDA.

### A. Defendants' False Statements and Omissions Concerning the Adequacy of Meredith's Internal Controls Over Financial Reporting

178. Meredith's Forms 10-K and 10-Q filed during the Class Period contained substantially similar false certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Harty and Ceryanec and attached as exhibits to each such filing. Specifically, Meredith included such certifications with the Company's February 2, 2018 Form 10-Q, May 15, 2018 Form 10-Q,

August 31, 2018 Form 10-K, November 9, 2018 Form 10-Q, February 11, 2019 Form 10-Q, May 13, 2019 Form 10-K/A, and May 14, 2019 Form 10-Q. Within each certification, Harty and Ceryanec attested, in pertinent part:

1. I have reviewed this Quarterly Report on Form 10-Q [or Annual Report on Form 10-K] of Meredith Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

179. In addition, regarding the evaluation of Time's existing controls and procedures, Meredith's Form 10-K filed September 4, 2018 and signed by Defendants Ceryanec, Harty and Lacy (which Meredith amended on May 14, 2019), had previously claimed that "[o]n the basis of the evaluation performed, management concluded that internal control over financial reporting was effective as of June 30, 2018."

180. Defendants' statements in ¶¶178–79 were materially false and misleading when made because, as Meredith has admitted, hidden from investors at the time: (i) Meredith "had a material weakness in internal control over financial reporting as of June 30, 2018"; (ii) Meredith had "deficiencies related to internal controls over the processes to establish the fair value of certain assets and liabilities in the opening balance sheet for Time Inc."; (iii) Meredith "management identified ineffective process-level controls over the completeness, existence, accuracy, and valuation of certain acquired assets and assumed liabilities on the acquisition date of January 31, 2018, specifically, accounts receivable; property, plant, and equipment; other current assets; other assets; accounts payable; accrued liabilities; unearned revenues; and other noncurrent liabilities, and over the review of certain revenue contracts relating to amounts recorded in unearned revenue, due to an ineffective risk assessment process over the measurement and recognition of certain acquired assets and assumed liabilities of Time"; and (iv) due to these material weaknesses in

internal controls and the failed Time integration, Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollars in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity." Defendants' failure to disclose the foregoing material facts also rendered their statements materially false and misleading by omission when made.

181. Indeed, even after Meredith's April 4, 2019 Current Report revealed that, as of March 31, 2019, it recognized that it had material weaknesses in its internal controls failure over financial reporting related to the Time acquisition beginning on June 30, 2018, the Company did not alter its SOX Certifications, which Defendants Harty and Ceryanec continued to certify.

### B. Defendants' False Statements and Omissions Concerning Meredith's Purported Plan to "Hit the Ground Running" with Its Integration of Time, the Status of Its Integration of Time, and Reduction of Low-Margin Subscriptions

#### 1. Defendants' Statements on Meredith's January 31, 2018 Investor Call Announcing the Completion of the Time Acquisition

182. On January 31, 2018, Meredith held a conference call with investors to announce completion of its purchase of Time. Defendants Lacy, Harty, Ceryanec, and Werther participated in the call. Defendant Lacy touted Meredith's "excellent track record of achieving cost synergies with prior acquisitions" and his confidence in Meredith's "ability to optimize the cost structure of the combined business." In a press release before the conference call, Harty claimed that "[s]ince our announcement [in November 2017 of Meredith's acquisition of Time], teams from Meredith and Time have been developing <u>an integration plan that has positioned us to hit the ground running</u>."

183. Defendant Harty also said Meredith would "bring the advertising and circulation performance of the acquired Time properties to at least industry norms by the start of calendar 2019." Harty continued:

> [W]e're going to see sequential improvement quarter-to-quarter through the remainder of 2018 and really getting ready for the calendar year 2019. We think that's when it'll be steady state going forward and getting them back into, what we would say, the industry performance, which would be about half of the decline of what they've been saying.

Regarding other aspects of the Meredith plan to integrate Time's assets, Harty insisted, "[I]t's not a real stretch for [Meredith] to undo [Time's missteps]."

184. Similarly, in response to an analyst's statement that "the gist of what you're saying is that it's not very difficult to do some of those things [to integrate Time's assets]," Defendant Ceryanec said, "That's correct."

185. As of the start of the Class Period on January 31, 2018, Defendants' statements referenced in ¶¶182–84 were materially false and misleading when made. Contrary to Defendants' statements at that time, and hidden from investors, (i) Meredith lacked an adequate plan to integrate Time's finance and IT functions with Meredith's and realize the claimed synergies from the Time acquisition; and (ii) Meredith understood, or recklessly disregarded, by the time of the acquisition, the amount of low-margin subscriptions in the legacy Time brands and the significant costs to reduce or eliminate Meredith's reliance on those subscriptions.

#### 2. Defendants' February 8, 2018 and May 15, 2018 Statements Regarding the Cost of Integrating Time

186. On February 8, 2018 and on May 15, 2018, Meredith filed Forms 10-Q that misrepresented the costs required for integrating Time Inc. by claiming "[t]he Company currently estimates that it will incur costs of approximately $300 million related to integration, which include severance and portfolio alignments, to achieve these synergies. These costs are expected to be

spread evenly between the first two years of operations." Defendant Ceryanec signed both Forms 10-Q filed on February 8, 2018 and on May 15, 2018.

187. Meredith and Ceryanec's statements in ¶186 were materially false and misleading when made. Meredith's stated $300 million in costs "related to integration" was understated and lacked a reasonable basis because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (viii) Meredith would engage in significant additional investment spending related to the integration due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

### 3. Defendants' March 21, 2018 Statements Relating to the Status of the Integration of Legacy Time Brands

188. On March 21, 2018, Meredith issued a press release discussing the status of its integration of the legacy Time brands. In it Meredith wrote that its "strategy centered on four major initiatives," including to "Achieve annual cost synergies in $400 million to $500 million range in first two years of operations" and "Improve advertising and circulation performance of

the Time Inc. properties to industry norms." The press release quoted Defendant Harty as claiming, "We have made significant progress executing on these initiatives since we closed on the acquisition just six weeks ago."

189. Defendants' statements referenced in ¶188 were materially false and misleading because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (viii) Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

#### 4. Defendants' May 10, 2018 Statements Reporting on Fiscal Third Quarter 2018 Results

190. In a May 10, 2018 press release, Meredith announced its fiscal third quarter 2018 earnings, and stated that it was "implementing its proven strategies, standards and discipline across the legacy Time Inc. portfolio to improve performance, including aligning it with Meredith's

successful sales structure." The press released continued, "Meredith expects to see meaningful improvement in advertising results for the acquired Time Inc. brands starting in fiscal 2019." The press release detailed how Meredith was implementing its "proven strategies, standards and discipline" to "improve performance" of Time assets, claiming, "Regarding circulation, Meredith has launched a large-scale initiative to use its much larger subscription database to cross-promote titles to increase circulation revenue and lower subscription acquisition costs."

191. On the same day, May 10, 2018, Meredith held a conference call with investors to discuss its fiscal 2018 third quarter earnings report. Defendants Lacy, Harty, Ceryanec, and Werther participated in the call. During this call, Defendants misrepresented Meredith's preparedness to integrate Time's assets into the Company. With respect to Meredith's efforts to rectify Time's prior misalignment of its advertising along product rather than brand focus, Harty stated:

> They have underperformed the industry due to a mid-2016 realignment of their advertising sales force. We have quickly implemented Meredith's strategies, standards and disciplines across the portfolio to improve performance. These include installing publisher at the brand level responsible for brand-specific sales for the print titles we acquired; maximizing our very successful and experienced sales team, which acts as a central point of contact for our largest advertising relationships and streamlines client-agency communication; leveraging our industry-leading digital sales team to focus on scalable and innovative solutions for our marketing partners; and generating nontraditional revenue through our opportunistic direct media sales team.

Harty continued, "[W]e expect to see meaningful improvement in our advertising results as we progress through fiscal year 2019, which starts July 1, 2018."

192. Similarly, Defendant Lacy said, "We're very pleased with the integration work so far, including the progress we're making on cost synergies that we expect to achieve." Lacy also told investors, "We have a lot to accomplish, but [we] have really hit the ground running."

193. Repeating Meredith's mantra that it was ready to "hit the ground running" on its integration of Time, Defendant Ceryanec said, "We had a head start on many of the initiatives that Steve and Tom discussed today because we're able to close just 2 months from the time we announced the deal."

194. On the same call, Harty had the following exchange with an analyst from Gabelli & Company:

> [ANALYST:] I just want to come back to the top line again. We talked a lot about the synergies and the pace they are in. But the degradation of Time's business, which started after they changed the go-to market strategy and the whole thing just sunk. How quickly can your new publishers, if they are new, and the new sales strategy have a more favorable effect? And other than page sales [or] revenues, what are the kind of guideposts that would tell you that you're moving the in the right direction ahead of that? And at this juncture just a few months in, are there any specific successes that you can point to and identify and say yes, this is what we need to do more – it's working and we need to do more of this?
>
> [HARTY:] As we've talked about before, it isn't an overnight switch that you flip to make this happen. But we're really, really confident that we're going to see improvement quarter to quarter. There is a little bit of a selling time that goes into play. So I would say that it's going to take 3 quarters for us to get into the range that we'd see at Meredith. But we're going to see quarter-over-quarter kind of sequential improvement on the Time legacy brands. The good news is that we had a – that a lot of former publishers and former sales leaders were still in the company. There were just off in the sales verticals and not representing the brand. So we could actually put them back, the publisher from *Sports Illustrated*, the publisher from – we move somebody to *Shape*. So we feel really confident that we have the team in place. And while it's not a quantifiable response, the response that we've gotten from – the soft response from the marketplace is incredible. Like our publisher from *Real Simple* sent me an email last night that – from a client just saying that it's so refreshing to have someone actually making a sales call. We know who to call, who is representing *Real Simple*. So it's in place, it's happening. We did that last month [in April 2018]. And we're confident we're going to see improvement over the next 3 quarters. And you kind of think about calendar '19 as kind of the run rate to go forward.

195. Defendants' statements referenced in ¶¶190–94 were materially false and misleading because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal

audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (viii) Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

#### 5. Defendants' August 10, 2018 Statements Reporting on Fiscal Fourth Quarter and Full Year 2018 Results

196. In an August 10, 2018 press release announcing its fiscal fourth quarter 2018 and full year earnings, Meredith repeated its claim that it was "implementing its proven strategies, standards and discipline across the legacy Time Inc. portfolio to improve performance, including aligning it with Meredith's successful sales structure." Likewise, the press release continued, "Meredith expects to see meaningful improvement in advertising results for the acquired Time Inc. brands during fiscal 2019."

197. On the same day, August 10, 2018, Meredith held a conference call with investors in connection with its earnings report. Defendants Lacy, Harty, Ceryanec, and Werther participated in the call. During this call, Defendants misrepresented both the amount of cost synergies

achievable after the acquisition and Meredith's preparedness to integrate Time's assets into the Company. Defendant Harty insisted that Meredith had identified and addressed the problems that led to Time's downward-trending performance in recent years, repeating his talking points from the May 10, 2018 conference call, saying:

> Since 2016, they have underperformed the industry due to a realignment of their advertising sales force by their previous owner. <u>We quickly implemented Meredith's strategies, standards and disciplines across the portfolio to improve performance</u>. These includ[ed] installing publishers at the brand level responsible for brand-specific sales for the print titles we acquired; maximizing our very successful and experienced corporate sales team, which acts as a central point of contact for our largest advertising relationships and streamlines client agency communication; leveraging our industry-leading digital sales team and programmatic advertising efforts to focus on scalable and innovative solutions for our marketing partners; and capitalizing on our performance marketing solutions and generating nontraditional revenue [through] our [opportunistic] direct media sales team."

198. In response to an analyst inquiry regarding "the pace of improvement and trends to date [for the Time brands]" during the question period of the August 10, 2018 investor call, Harty said:

> It's going to take a little bit of time for us to turn around the Time Inc. assets from a print advertising perspective because of the long lead time that print is sold. And we expect to see quarter-over-quarter sequential improvement as we go through the year. So in the fourth quarter that we just closed, they were down kind of in the low 20% range. And we're seeing that improve in our next quarter coming to that high-teen level. So kind of what we expected to see, kind of a 6% to 7% improvement quarter-over-quarter.

Harty continued, "[O]verall, we're kind of seeing the marketplace improving, <u>we are seeing Time Inc. improve as we've kind of implemented our strategies</u> and we're going to see <u>sequential improvement</u> as we go through the fiscal year." In the press release accompanying the conference call, Harty had similarly stated, "We expect to see <u>meaningful improvement</u> in advertising results for the acquired Time, Inc. brands during fiscal 2019."

199. Later, in response to another analyst's inquiry, which addressed "the magnitude of print improvement," Harty said:

> So I think that it doesn't flip overnight, <u>but we're anticipating, as I mentioned, on the Time side, we're going to see improvement in the fiscal first quarter, down from what they saw at the close in fourth</u>. We're going to see additional improvement on the Meredith side and that's going to continue into the second fiscal quarter. And then really, <u>when we get into that third quarter</u> or the beginning of the calendar year, that's where we see both of the portfolios kind of getting into the same performance level. So <u>that's where we feel the Time legacy titles will be performing in that Meredith range or even a little bit better than us, because they have – will have – be[en] up against such low comps</u>.

200. Defendants' statements referenced in ¶¶196–99 were materially false and misleading because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (viii) Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

**6. Defendants' November 7, 2018 Statements Reporting on Fiscal First Quarter 2019 Results**

201. On November 7, 2018, Meredith held a conference call with investors in connection with its fiscal 2019 first quarter earnings report. Defendants Lacy, Harty, Ceryanec, and Werther participated in the call. During this call, Defendants misrepresented both the amount of cost synergies achievable after the acquisition and Meredith's preparedness to integrate Time's assets into the Company.

202. At the end of his prepared remarks during the November 7, 2018 conference call, Defendant Lacy said, "In my closing comments this morning, I want to remind everybody that we continue to expect the process of integrating Time Inc. and optimizing our new and combined National portfolio to have a 2-year timeline."

203. Defendant Harty provided further elaboration following Lacy's remarks. Harty said:

> When we closed on the Time Inc. acquisition, we outlined a go-forward strategy consistent of 5 key components: Improving the advertising performance of the acquired Time Inc. properties to Meredith's historic levels, aggressively growing revenue and raising the profit margin of the acquired Time Inc. digital properties to Meredith's high levels, accelerating the growth of high-margin consumer related revenue by leveraging our expanded brand portfolio, conducting a portfolio review of the media assets and divesting those not core to our business, and fully realizing at least $550 million range of annual cost synergies by the end of the first 2 full years of operation.
>
> Let me provide you with more detail on our progress for each of these initiatives, beginning with improving the advertising performance of the acquired Time Inc. properties to Meredith's historic levels.
>
> As we've previously communicated, it will take time to turn around the performance of the Time Inc. legacy brands. We quickly implemented Meredith's strategies, standards and disciplines across the portfolio to improve performance. We delivered improved sequential comparable print advertising revenue performance in the first quarter of fiscal 2019. We expect continued improvement in the second quarter with declines moderating to the single-digit levels in total in the second half of fiscal 2019.

204. Similarly, also on the November 7, 2018 conference call, Defendant Ceryanec touted the progress Meredith was making with respect to integrating Time's assets following the acquisition. Ceryanec told investors, "[T]he performance in our National Media Group, including our work to integrate Time Inc. is meeting our expectations. Execution by our team remains strong. And as expected, we see improving trends so far in our fiscal second quarter."

205. During the question period of the investor conference call on November 7, 2018, Defendants continued making false and misleading statements with respect to the performance of Meredith assets acquired from Time. Lacy told investors, "Legacy Time, as best you could break that apart is improving." Likewise, Harty said, "[W]e're starting to see some of the Time Inc. brands actually match the historical levels of Meredith. So we're seeing improvement quarter-to-quarter."

206. Defendants' statements referenced in ¶¶201–205 were materially false and misleading because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (viii)

Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

**7. Defendants' February 11, 2019 Statements Reporting on Fiscal Second Quarter 2019 Results**

207. On February 11, 2019, Meredith held a conference call with investors in connection with its fiscal second quarter 2019 earnings report. Defendants Harty, Ceryanec, and Werther participated in the call. During this call, Defendants misrepresented both the amount of cost synergies achievable after the acquisition and Meredith's preparedness to integrate Time's assets into the Company.

208. During the conference call, Defendant Harty addressed the integration of Time's assets into Meredith, telling investors:

> It was just over 1 year ago when we closed on the acquisition of Time Inc. Since then, we've made significant progress on the 5 key strategic initiatives that we put in place to integrate and maximize our new portfolio.
>
> To start, we said [we] would improve the advertising performance of the acquired Time Inc. properties to Meredith's historical levels over time. To accomplish this, <u>we executed 3 key initiatives: first, we reorganized the way these brands went to market and implemented Meredith's sales and operating strategies, standards and disciplines across the portfolio; second, we invested in sales and marketing resources and activities</u>; third, we aggressively marketed the new portfolio, resulting in increased access to new advertising and marketing budgets, even though most clients had already allocated the bulk of their calendar 2018 advertising budgets.
>
> As calendar 2018 progressed, we kept at it, securing victories large and small along the way. These moves earned our brands several agency preferred partnerships and access to calendar 2019 advertising campaigns.
>
> As a result, as we look into early calendar 2019 advertising performance, <u>we see comparable print advertising revenue performance down in the mid-single digits</u>. This is true to brands in both the legacy Meredith and legacy Time Inc. portfolio.

209. In addition, Harty claimed that the integration was proceeding successfully because "[W]e've fully integrated our HR, finance, legal and IT functions."

210. During the question period of the February 11, 2019 conference call, in response to an analyst question about how the first quarter compared to historical trends, Defendant Ceryanec said, "[T]he Time portfolio and the Meredith portfolio, are both kind of in line with, as we've talked about, historical Meredith trends. So a real significant improvement as we moved into Q3 on the Time portfolio, especially." Likewise, Defendant Harty, in response to an analyst's question specific to the performance of *People* magazine, told investors that legacy Time assets were performing in line with Meredith's historical levels:

> *People* is improving across the portfolio. So we're seeing the same improvement that we're seeing, I talked about 800 basis point improvement quarter-over-quarter. We're seeing the same kind of improvement in *People* also. So this is – we've got some titles now on the Time legacy side that are actually up year-over-year, which we're excited about, but when you take in blended together, as I said before, the whole portfolio is kind of performing about the same. When you look back at the – when they had really poor performance, when they went through the reorganization a couple of years ago, you could point at the portfolio and see that the brand is performing the same. So we're seeing the recovery come back the same way.

211. Later, also on the February 11, 2019 investor call, Defendant Harty responded to an analyst's question about Meredith's stated synergy goal of $550 million and advertising impact on that figure and reiterated the Time assets performance with respect to historical Meredith trends. Harty said, "[O]ur hypothesis hasn't changed on where we believe print advertising is now as we're seeing the Time portfolio start to perform similar to the Meredith portfolio."

212. Defendants' statements referenced in ¶¶207–11 were materially false and misleading because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time

was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (viii) Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

**8. Defendants' May 10, 2019 Statements Reporting on Fiscal Third Quarter 2019 Results**

213. On May 10, 2019, Meredith held a conference call with investors in connection with its fiscal 2019 second quarter earnings report. Defendants Harty, Ceryanec, and Werther participated in the call. During this call, Defendants misrepresented both the amount of cost synergies achievable after the acquisition and Meredith's progress integrating Time's assets into the Company. During the call, Defendant Harty said, "While it took longer than we initially expected to turn around the advertising performance [] at the legacy Time brands, <u>we are now in line with Meredith's historical and expected long-term performance</u>." Specifically, Harty pointed to Meredith's actions related to "<u>investing in more profitable sources of subscription acquisition</u>, particularly because we inherited some low-margin, agent-sourced subscriptions from the acquisition of Time Inc." Harty claimed that "<u>we are now in line</u> with Meredith's historical and

expected long-term performance" and "we've accomplished a great deal since we closed on the Time Inc. acquisition."

214. Later in the call, Defendant Werther provided details regarding the performance of print media, including the legacy Time assets. Werther said:

> [W]e said we would improve the print advertising performance of the acquired Time Inc. properties to Meredith's historic levels over time and we did. To accomplish this, we executed 3 key initiatives. First, we reorganized the way these brands went to market and implemented Meredith's sales and operating strategies, standards and disciplines across the portfolio; second, we invested in sales and marketing resources and activities; and third, we aggressively marketed the new portfolio, resulting in increased access to new advertising and marketing budgets.
>
> As a result, third quarter comparable year-over-year print advertising revenue performance improved significantly and is in line with the performance we expect. Legacy Meredith brands have been performing consistently and the improvement we delivered in our fiscal third quarter was driven primarily by the acquired Time Inc. brands.
>
> As we look into the fourth quarter, we anticipate further improvement driven again by many of the acquired brands, some of which look to be up in print advertising year-over-year. . .
>
> Looking into the fourth quarter, we anticipate further year-over-year revenue and margin improvement.

215. During the question period of the May 10, 2019 investor call, Defendant Harty responded to an analyst who asked about the "decline and the growth" of "print and digital on a comparable basis." Harty said, "When you look at the last 2 trailing quarters for the print combined portfolio, it was down 16%. So from 16% down to minus 7% and actually we see trending in the fourth quarter that it's going to improve again. So we're finally getting the portfolio of the Time Inc. side [turned around]."

216. Defendants' statements referenced in ¶¶213–15 were materially false and misleading because, hidden from investors: (i) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (ii) Meredith's integration of Time was failing; (iii)

Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (iv) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (v) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (vi) Meredith would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

**9. Defendants' Statements Concerning the Time Integration in Meredith's June 10, 2019 Press Release Announcing Defendant Werther's Departure from the Company**

217. On June 10, 2019, Defendants issued a press release announcing the abrupt departure of Defendant Werther from the Company. The press release, which Meredith filed with the SEC that day on a Form 8-K signed by Defendant Ceryanec, said:

> Meredith Corporation [] announced today that National Media Group President Jon Werther has decided to leave Meredith, effective immediately.
>
> "We thank Jon for his numerous accomplishments in his six years of service to Meredith, and wish him well in the future," said Meredith President and Chief Executive Officer Tom Harty. "Going forward, our National Media Group will continue to build on its industry-leading position of reaching 140 million American women every month, including more than 80 percent of U.S. millennial women."
>
> Harty said that Meredith does not plan to immediately fill the position, and that the group's senior leadership team will now report directly to him. Harty previously served as Meredith National Media Group President from 2010 to 2016.
>
> In January 2018, Meredith closed on its acquisition of Time Inc., establishing the company as the country's largest magazine publisher and a Top 10 digital player. <u>Since then, Harty said Meredith has made tremendous progress integrating the acquisition</u>.

> "We have turned around the advertising performance of the print brands we acquired, grown the digital business, and significantly increased consumer revenues," Harty said. "Additionally, we've sold most of the assets that didn't fit our portfolio, and have made excellent progress on synergy achievement and debt reduction."
>
> "As we close our fiscal 2019 and enter fiscal 2020 next month, I think this is a good time to pivot and assess where we are and what steps need to be taken to build upon our momentum, including the optimum leadership structure to drive organic revenue growth," Harty continued. "We continue to be very excited and confident about the future of Meredith Corporation, and our ongoing ability to increase shareholder value and create meaningful career opportunities for our more than 7,000 employees nationwide."
>
> Harty said Meredith continues to expect full-year fiscal 2019 adjusted EBITDA to range from $700 million to $710 million, and adjusted earnings per share to range from $6.92 to $7.07, both in-line with the outlook provided in Meredith's fiscal 2019 third-quarter earnings release issued on May 10, 2019.

218. Defendants' statements referenced in ¶217 were materially false and misleading because, hidden from investors: (i) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (ii) Meredith's integration of Time was failing; (iii) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (iv) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (v) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little over that time, and that remedying them would require significant additional investment; and (vi) Meredith would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity."

### 10. Defendants' August 28, 2019 Statements Reporting Fiscal Year 2019 Results

219. On August 28, 2019, Meredith issued a press release in advance of its scheduled September 5, 2019 conference call with investors to report its fiscal 2019 fourth quarter and full year financial results. The press release, filed with the SEC on a Form 8-K on August 30, 2019, and signed by Defendant Ceryanec, stated in part:

> Meredith today reiterated that it expects full-year fiscal 2019 financial results to be in line with the outlook provided in its fiscal 2019 third quarter earnings release on May 10, 2019, with the exception of earnings from continuing operations, which will be lower due primarily to non-cash trademark impairment charges.

220. Defendants' statements in ¶219 were materially false and misleading when made. It was misleading for Defendants to state that the Company "expects full year fiscal 2019 financial results to be in line with the outlook provided in its fiscal 2019 third quarter earnings release" except for costs related to "non-cash trademark impairment charges" when, in truth, Meredith was about to release a disastrous earnings report that would highlight that the Company had been struggling for more than a year to integrate Time's assets into the Company, that its attempts to integrate Time were failing and that a number of former Time publications had a large amount of low-margin subscriptions and that all such problems would be costly for Meredith to rectify.

221. Indeed, Defendants' statements referenced in ¶¶219–220 were materially false and misleading because, hidden from investors: (i) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (ii) Meredith's integration of Time was failing; (iii) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (iv) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (v) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little

over that time, and that remedying them would require significant additional investment; and (vi) Meredith would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity." Defendants' failures to disclose the foregoing material facts also rendered their statements in this section of the Amended Complaint materially false and misleading by omission when made.

### C. Defendants' False and Misleading Statements and Omissions Concerning Meredith's Claimed Synergies from the Time Acquisition and Its Ability to Earn $1 Billion in EBITDA

222. Throughout the Class Period, Defendants repeatedly claimed that Meredith would achieve the high end of a $400-$500 million range of synergies as a result of the Time integration and achieve $1 billion in EBITDA in fiscal year 2020. As set forth below, these claims lacked a reasonable basis and were misleading by omission because they failed to disclose adverse material facts known to Defendants.

223. On January 31, 2018, Meredith filed with the SEC a press release on Form 8-K, signed by Defendant Ceryanec, announcing the completion of Meredith's acquisition of Time. In the press release, Meredith said:

> Meredith anticipates generating annual cost synergies <u>at the high end of its previously stated range of $400 million to $500 million in the first two full years of combined operations</u>. Meredith has an excellent track record of achieving cost synergies with prior acquisitions, and is confident in its ability to optimize the cost structure of the combined business.

224. During the conference call in connection with the press release and Meredith's fiscal 2018 second quarter earnings, Defendants falsely claimed:

- [**LACY**]: "[T]his combination meaningfully enhances our financial strength and flexibility. <u>We expect to generate cost synergies at the high end of the previously stated range of $400 million to $500 million within</u>

the first two full years of combined operations. We have an excellent track record of achieving cost synergies with prior acquisitions, and are confident in our ability to optimize the cost structure of the combined business.";

- [**HARTY**]: "Our go-forward strategy consists of 4 key components . . . four, fully realize the high end of the $400 million to $500 million range of annual cost synergies within the first 2 full years of operation.";

- [**HARTY**]: "[W]e are very focused on fully realizing the high end of the $400 million to $500 million range of annual cost savings within the first 2 full years of operation. Given our previous initiatives to acquire Time Inc., we are very familiar with the available synergy opportunities. We are laser-focused on this goal and will bring to bear the cost discipline you've come to expect from Meredith.";

- **[CERYANEC]**: "I know there's a lot of questions out there, given the fact that Time Inc., on a standalone basis, had announced a project to pull cost out of the business. And obviously, we're talking about $400 million to $500 million. We are in the process of working with the Time folks, including they had engaged Mackenzie [sic] to work with them to really analyze what the type of items were that were behind their $400 million and how those relate to our $400 million to $500 million. I think, as I said earlier on the call, as we looked at how they closed out 2017, there were about $25 million of cost savings that I would say would have been part of their $400 million number . . . [W]e're focused on the high end [of that range]. . ."; and

- [**LACY**]: "[W]e are very, very aggressively moving on the revenue side and also, obviously, on delivering on the synergies."

Meredith filed the January 31, 2018 conference call transcript on a Form 8-K, signed by Ceryanec, with the SEC on February 1, 2018.

225. On March 5, 2018, Defendant Lacy made several false and misleading statements at the Deutsche Bank Media, Telecomm and Business Services Conference in Palm Beach, FL, repeating Defendants' claims that Meredith would achieve the synergy targets of $400 million to $500 million in the first two full years operations. Defendant Lacy said:

- "We've meaningfully enhanced our financial strength and flexibility, expecting to generate cost synergies in the range of $400 million to $500 million in the first 2 full years of operations, and I think the easy way to think about this is in calendar '18 and calendar '19. We have an excellent track record of delivering on our synergy targets with many acquisitions that we've made over time";

- "Our playbook is really the same one that we have operated against and delivered strong results over many years. And it's really founded on 4 intersecting pillars . . . [including] realizing the synergy targets that we've discussed in the first 2 full years of operation";

- "Given our previous initiatives and attempts to acquire Time, Inc., we are very, very familiar with the cost side of the equation and in fact, had the opportunity to work these synergy numbers 3 different times. The largest piece you'll see is at the top of the chart (slide 18 on 2/28/18 investor presentation) from eliminating not only duplicative public company expenses but duplicative functional activities between the 2 companies, finance, circulation, production, IT, and we believe that we can achieve synergies in the $200 million to $300 million range from these activities at the top. The next comes real estate and vendor contract activities, another $80 million to $100 million here along with circulation, fulfillment and other initiatives that will generate about the same amount of synergies. A big piece of that comes from closing Time Inc.'s fulfillment activity in Tampa, that we announced about 10 days ago. So when you put all this together, we are extremely confident that we will deliver the synergies that we have been talking about, and that we'll do it in again the first 2 years of operations"; and

- "Another example in the synergies, in the administrative area, we operate all of our back-office activities from our corporate headquarters in Des Moines, Iowa. Circulation, production, IT, finance, legal, all of that. All that stuff on the Time Inc. side, mostly in New York, we have 125 accountants. They have 350 accountants in New York. So I don't think the combined company needs 475 accountants, maybe 200, maybe 250, and the price is about half in Des Moines of what it is in New York. So those are things, they take a little while. You've got to hire people and move the activities. But those things are within our control. They don't have to deal with the whims of the advertising marketplace on the cost side."

226. On May 10, 2018, Defendants made a number of false and misleading statements in connection with the release of Meredith's fiscal 2018 third quarter earnings regarding the anticipated synergies of the Time acquisition, which they increased to more than $500 million, as well as the Company's expected $1 billion in EBITDA by the end of fiscal 2020. In the press release accompanying the May 10, 2018 earnings reports (which Meredith filed with the SEC that day on a Form 8-K, signed by Ceryanec), Defendants falsely stated:

- "'Our legacy Meredith businesses are performing in-line with our stated expectations, and we are aggressively focused on successfully integrating

the acquired Time Inc. properties; strengthening our planned asset divestitures; and delivering on our synergy targets, which we now expect will exceed $500 million annually,' said Meredith Corporation Executive Chairman Stephen M. Lacy. 'With these initiatives, we have set a goal to reduce our debt by $1 billion by the end of fiscal 2019 and generate $1 billion of EBITDA in fiscal 2020'";

- "Key Strategic and Financial Benefits of the Time Inc. Acquisition (excluding assets sold or held for sale) . . . Enhances financial scale and flexibility – Meredith anticipates generating annual cost synergies that exceed $500 million in the first two full years of combined operations. Meredith has an excellent track record of achieving cost synergies with prior acquisitions, and is confident in its ability to optimize the cost structure of the combined business";

- "Meredith is pursuing the following strategies with a goal of successfully integrating its acquisition of Time Inc. and maximizing the value of the combined media portfolio by . . . Exceeding $500 million of annual cost synergies within the first two full years of operation. Approximately half of these savings are expected to come from reductions in headcount, and the remaining half from savings in vendor contracts, real estate, and other non-headcount-related activities"; and

- **[HARTY]**: "We are aggressively integrating the acquisition and forging a path for the 'New Meredith' in the marketplace . . . Most notably, we have named publishers for all legacy Time Inc. premium-content brands. On the synergy front, we are well underway identifying cost savings that should push us beyond the $500 million level."

227. During the conference call in connection with the May 10, 2018 press release and Meredith's fiscal 2018 third quarter earnings, Defendants falsely claimed:

- [**LACY**]: "February was our first month of combined operations as a new and combined company and there are still many moving parts . . . [including] a great deal of work on cost synergies";

- [**LACY**]: "Here are a few key observations . . . We're very pleased with the integration work so far, including the progress we're making on cost synergies that we expect to achieve";

- [**LACY**]: "When we announced the deal, we estimated a synergy range of $400 million to $500 million. After just 3 months of operations as a new and combined company, we now expect to exceed the high end of that range, the $500 million mark";

- [**LACY**]: "[T]he combination meaningfully enhances our financial scale and flexibility. Again, we expect annual cost synergies to exceed $500 million by the end of the first 2 full years of operation. We have an excellent track record of achieving these cost synergies in prior acquisitions and are confident in our ability to optimize the cost structure of the new and combined business";

- [**LACY**]: "We're very confident in our plan and have set a goal to deliver $1 billion of debt reduction in fiscal 2019 and generate $1 billion of EBITDA in fiscal 2020" (Lacy said this twice);

- [**HARTY**]: "When we announced the completion of the Time Inc. acquisition, we outlined a go-forward strategy consisting of 4 key components . . . fully realizing the high end of the $400 million to $500 million range of annual cost synergies by the end of the first 2 full years of operations . . ." (Harty said this twice);

- [**CERYANEC**]: "As we look out and recognize synergies over the next 2 years, we expect the National Media, I'll call it, EBITDA margins to be in the high 20s to low 30s";

- [**CERYANEC**]: "I would say that when we did our initial synergy range that was based on diligence work, as we expected, once we got into the detail, we got into the procurement operations, and we started looking at really combining on a detailed basis. We feel a lot more confident being – or pushing beyond that $500 million number. And I would say even today, I guess, we're 4 months -- not even 4 months after close, we've got our eyes on. And when I say eyes on, meaning we got work to do to execute, but we've got our eyes on almost $500 million right now. And as Tom said, about half of that is headcount related and about half of it is other third-party vendor or facilities or other operations";

- [**HARTY**]: "I think our goal – stated goal has been to realize the synergies in the first 2 full years of operation. I think we're – why we're putting out $1 billion in fiscal 2020 is we're optimistic that we can get the vast majority of those [synergies] out in the next fiscal year. So between – by the close of fiscal '19 next June, we'll have the vast majority of the synergies out"; and

- [**HARTY**]: "I would say that it's going to take 3 quarters for us to get into the range that we'd see at Meredith."

Meredith filed the May 10, 2018 investor conference call transcript on a Form 8-K, signed by Ceryanec, with the SEC on May 10, 2018.

228. On June 7, 2018, Meredith filed a Form 8-K with the SEC, signed by Ceryanec, and attached a set of PowerPoint slides Defendants used in meetings with investors. In the slide deck, Defendants falsely stated Meredith would "Fully realize annual cost synergies in the $400 to $500 million range in the first two full years of operations."

229. On August 10, 2018, Defendants made a number of false and misleading statements in connection with the release of Meredith's fiscal 2018 fourth quarter and full year earnings regarding the more than $500 million in anticipated synergies from the Time acquisition as well as the Company's expected $1 billion in EBITDA by the end of fiscal 2020. In the press release accompanying the August 10, 2018 earnings reports (which Meredith filed with the SEC that day on a Form 8-K, signed by Ceryanec), Defendants falsely stated:

- "Since closing the Time, Inc. acquisition on January 31, 2018, and reporting its fiscal 2018 third quarter earnings on May 10, 2018: Meredith reaffirmed its goals of reducing debt by $1 billion in fiscal 2019 and generating $1 billion of adjusted EBITDA in fiscal 2020";

- "Meredith is on target to generate over $500 million in annual cost savings in the first two full years of operations following the acquisition which, combined with expected revenue performance improvement, will help Meredith achieve its goal of generating $1 billion of adjusted EBITDA in fiscal 2020";

- [**HARTY**]: "We are on track to deliver more than $500 million of annual synergies in the first two full years of operations";

- [**HARTY**]: "Given the progress made on synergy achievement and asset divestitures, we expect to achieve our goals of reducing debt by $1 billion by the end of fiscal 2019 and generating $1 billion of adjusted EBITDA in fiscal 2020";

- "Meredith anticipates generating annual cost synergies exceeding $500 million in the first two full years of combined operations. Meredith has an excellent track record of achieving cost synergies with prior acquisitions, and is confident in its ability to optimize the cost structure of the combined business"; and

- "Meredith is pursuing the following strategies with a goal of successfully integrating its acquisition of Time Inc. and maximizing the value of the

> combined media portfolio: . . . Exceeding $500 million of annualized cost synergies within the first two full years of combined operations."

230. During the conference call in connection with the August 10, 2018 press release and Meredith's fiscal 2018 fourth quarter and full year earnings, Defendants falsely claimed:

- [**LACY**]: "We remain on target to generate more than $500 million in annual cost savings in the first 2 full years of operation post the Time Inc. acquisition, which will help us achieve our goal of generating $1 billion of EBITDA in our fiscal 2020";

- [**HARTY**]: "When we announced the completion of the Time Inc. acquisition, we outlined a go-forward strategy consisting of 5 key components . . . and fully realizing the high end of the $400 million to $500 million range of annual cost synergies by the end of the first 2 full years of operations . . . Our final go-forward strategy is to deliver cost savings related to the combination of the Time Inc. and Meredith businesses, and we expect to deliver more than $500 million of annualized cost synergies in the first 2 full years of operations";

- [**CERYANEC**]: "[T]he majority of our synergies we expect to deliver in fiscal 2019 will materialize in the second half of the fiscal year";

- [**LACY**]: "[W]e're confident in our plan to have a set a goal to deliver $1 billion in debt reduction in our fiscal 2019 and $1 billion of annual EBITDA in our fiscal 2020";

- [**CERYANEC**]: [A]s we look at our guidance for '19, we're in that $720 million to $750 million range [for EBITDA]. That includes about $300 million of expected synergies that we expect to deliver in the year. As I said in my comments, we expect that to be more back half loaded. We've got a lot of integration work to do over the next 5 to 6 months. We expect to have accounting systems, HRIS, payroll systems integrated by the end of the year. So then as we look at 2020, several of those synergies that we'll get in the back half of the year, we'll get a full year impact on 2020. And then when you add some incremental synergies, we expect to get about another $250 million in 2020. So real round numbers, if you take that, call it, $735 million, the middle of our range, add another $250-ish million of synergies, you got a lot of other puts and takes . . . And then when you take the growth in digital and licensing and some of the other things, you get yourself right around that $1 billion in 2020. But the big drivers are, think of it as $300 million of synergies in '19 and another $250 million in '20."

Meredith filed the August 10, 2018 investor conference call transcript on a Form 8-K, signed by Ceryanec, with the SEC on August 10, 2018.

231. On September 4, 2018, Meredith filed with the SEC its Form 10-K, signed by Defendants Ceryanec and Harty. In the 10-K, Defendants continued to make false and misleading statements about the synergies Meredith could achieve from the Time acquisition. The Form 10-K claimed:

> Meredith anticipates generating annual cost synergies that exceed $500 million in the first two full years of combined operations. Meredith has an excellent track record of achieving cost synergies with prior acquisitions, and is confident in its ability to optimize the cost structure of the combined business.

232. On September 6, 2018, Meredith filed a Form 8-K with the SEC, signed by Ceryanec, and attached a set of PowerPoint slides Defendants presented at the Benchmark Company Media/Entertainment Conference on September 6, 2018 in New York, NY. In the slide deck, which accompanied Defendants' presentation, Defendants repeated a number of the false and misleading claims they had been touting to investors throughout 2018:

- "Fully realizing annual cost synergies that exceed $500 million in the first two full years of operations";
- "Execute on more than $500 million in synergies"; and
- Meredith's Near Term Financial Goals – EBITDA Generation – $1 Billion in Fiscal 20".

233. On September 16, 2018, in a press release announcing the sale of *TIME* magazine to Marc and Lynne Benioff, Meredith said:

> Meredith is targeting a net debt-to-EBITDA ratio of 2.0x to 1 or better by the end of its fiscal 2020. This includes generating $1 billion of EBITDA and having net debt below $2 billion by the end of fiscal 2020."

234. On September 24, 2018, Meredith filed its Definitive Proxy Statement (the "2018 Proxy Statement") with the SEC in advance of Meredith's annual shareholder meeting on November 14, 2018. In the 2018 Proxy Statement, Defendants continued to make false and misleading statements with respect to the more than $500 million in synergies Meredith claimed

it would achieve as a result of the Time acquisition and the $1 billion in EBITDA Defendants claimed the Company would generate by the end of fiscal 2020. In the 2018 Proxy Statement, Defendants said:

- "[The Time acquisition] [e]nhances financial scale and flexibility – Meredith anticipates generating annual cost synergies that exceed $500 million in the first two full years of combined operations after the Time Inc. acquisition. We have an excellent track record of achieving cost synergies with prior acquisitions, and are confident in our ability to optimize the cost structure of the combined business"; and

- "[The acquisition] [p]ositions Meredith on a growth track not previously realizable – With the completion of this acquisition, we have set a goal to deliver $1 billion of debt reduction in fiscal 2019 and generate $1 billion of annual EBITDA in fiscal 2020."

235. On October 3, 2018, Defendant Harty made a presentation at the Deutsche Bank Leveraged Finance Conference in Scottsdale, AZ. In addition to Harty, Meredith Treasurer Kevin Wagner ("Wagner") also spoke during the Company's presentation. During this presentation, Harty and Wagner repeated Defendants' false and misleading statements with respect to the more than $500 million in synergies Meredith claimed it would achieve as a result of the Time acquisition and the $1 billion in EBITDA Defendants claimed the Company would generate by the end of fiscal 2020. They said:

- [**HARTY**]: "[Meredith will] fully realize $550 million of annual cost synergies in the first 2 full years of integration";

- [**HARTY**]: "[W]e feel very confident of achieving $550 million of synergies. We have budgeted approximately $300 million in costs to achieve these synergies, and believe these costs will flow-through the P&L evenly in year 1 and year 2 post-closing";

- [**HARTY**]: "As a result of the strategies we summarized today, we have goals to deliver the results you see here on Slide 21: reduce our debt by $1 billion in fiscal 2019 or by the end of this fiscal year in June of next year and generate $1 billion of EBITDA in fiscal 2020";

- [**WAGNER**]: "In fiscal 2020, we have the full benefit of our expected cost synergies realized, and we've set a goal to deliver $1 billion of adjusted EBITDA";

- [**WAGNER**]: "Assuming we hit our projections, the $1 billion of EBITDA that we expect to deliver in fiscal 2020, should translate into approximately $450 million of free cash flow. While we don't show it on this slide, we expect to complete our integration work in fiscal 2020, so the cost to achieve synergy line should drop to near 0 in fiscal 2021";

- [**WAGNER**]: "By the end of fiscal 2020, we expect our leverage to be less than 2x as we hit $1 billion of EBITDA and see debt come in at $1.9 billion"; and

- [**HARTY**]: "[S]ince we've been owning and operating it, we came out [and] increased our synergy target. Initially, at the close, we talked about $400 million to $500 million and now we're saying $550 million, kind of plus . . . So I feel very, very confident about the synergy total as that we've got laid out here."

On October 3, 2018, Meredith filed with the SEC the presentation Harty and Wagner used in Scottsdale on a Form 8-K signed by Ceryanec.

236. On November 1, 2018, in a press release announcing the finalization of the sale of *TIME* magazine to Marc and Lynne Benioff, Meredith, as it had in the press release announcing the sale in September 2018, said:

> Meredith is targeting a net debt-to-EBITDA ratio of 2.0x to 1 or better by the end of its fiscal 2020. This includes generating $1 billion of EBITDA and having net debt below $2 billion by the end of fiscal 2020."

237. On November 7, 2018, Defendants made a number of false and misleading statements in connection with the release of Meredith's fiscal 2019 first quarter earnings. In the press release accompanying the November 7, 2018 earnings report, Defendants falsely stated:

- [**HARTY**]: "We continue to expect to achieve our goals of reducing debt by $1 billion by the end of fiscal 2019 and generating $1 billion of adjusted EBITDA in fiscal 2020, meaningfully contributing to total shareholder return";

- "Delivering at least $550 million of annualized cost synergies within the first two full years of combined operations"; and

- "Meredith is targeting a net debt-to-EBITDA ratio of 2.0 to 1 or better by the end of its fiscal 2020. This includes goals to generate $1 billion of EBITDA and having net debt below $2 billion by the end of fiscal 2020."

Meredith filed the November 7, 2018 press release on a Form 8-K, signed by Ceryanec, with the SEC on November 7, 2018.

238. During the conference call in connection with the November 7, 2018 press release and Meredith's fiscal 2019 first quarter earnings, Defendants claimed:

- [**LACY**]: "We remain committed to our goal of delivering $1 billion of adjusted EBITDA in our fiscal 2020";

- [**HARTY**]: "When we closed on the Time Inc. acquisition, we outlined a go-forward strategy consisting of 5 key components . . . and fully realizing at least $550 million range of annual cost synergies by the end of the first 2 full years of operation";

- [**HARTY**]: "We expect to deliver at least $550 million of annualized cost synergies within the first 2 full years of combined operations";

- [**HARTY**]: "A few other items of note for modeling purposes, beginning with synergies. We continue to expect that the majority of the synergies we deliver in fiscal 2019 will materialize in the second half of the fiscal year";

- [**HARTY**]: "[W]e're confident in our plan. We've set a goal to deliver $1 billion of debt reduction in our current fiscal 2019 and $1 billion of annual adjusted EBITDA next year in fiscal 2020";

- [**HARTY**]: "On the synergies question, the margin question . . . So when we usually have in the National Media Group margins in the high double digits, we're budgeting this year fiscal 2019 to have margins approaching 25%. And then the following year, when we fully realize all the synergies, it will be approaching 30%. So that's how you get to the math"; and

- [**CERYANEC**]: "If we can get to the full $550 million of synergies and take credit for that going forward, our leverage today would be at 2.6x . . . And then our real target is in 2020, when we expect to be at $1 billion of EBITDA, debt at less than $2.2 billion with leverage of less than 2x by the end of 2020."

Meredith filed the November 7, 2018 investor conference call transcript on a Form 8-K, signed by Ceryanec, with the SEC on November 7, 2018.

239. On November 9, 2018, Meredith continued to make false and misleading statements with respect to the $1 billion in EBITDA it claimed it would achieve following the Time acquisition and the synergies the deal would create. First, in a press release announcing the sale of *Fortune* magazine to Chatchaval Jiaravanon, a billionaire from Thailand, Meredith repeated the same statement it made in its releases related to the sale of *TIME* magazine to Marc and Lynne Benioff:

> Meredith is targeting a net debt-to-EBITDA ratio of 2.0x to 1 or better by the end of its fiscal 2020. This includes generating <u>$1 billion of EBITDA</u> and having net debt below $2 billion by the end of fiscal 2020."

240. Then, in its Form 10-Q, signed by Ceraynec, filed with the SEC on the same day, Meredith claimed:

> As part of the Company's plan to realize cost synergies from the Time acquisition, <u>management committed to a performance improvement plan to reduce headcount, which is anticipated to be substantially complete by January 2019</u>.

241. On December 4, 2018, Defendants, Lacy, Harty, and Ceryanec presentated at the UBS Global Media and Telecommunications Conference in New York, NY. During this presentation, Defendants said:

- [**LACY**]: "Our integration work is <u>yielding synergies that are greater than we anticipated</u> at the very beginning";

- [**LACY**]: "As a result of our execution over the past year and our tremendous confidence in the new Meredith, we are setting aggressive financial goals of delivering $1 billion of debt reduction in our current year fiscal 2019, and that would be between now and June 30, and <u>another $1 billion of adjusted EBITDA next year in our fiscal 2020</u>";

- [**HARTY**]: "[T]he final strategy I'll address for our National Media Group is cost synergies. <u>We expect to fully realize $550 million of annual cost savings</u> within the first 2 full years of operation. We are laser focused on that goal and are bringing to bear the cost discipline you've come to expect from Meredith. The largest chunk will come from eliminating public company and duplicated functional expenses between our 2 companies";

- [**CERYANEC**]: "And in fiscal 2020, when we expect to recognize the full benefit of the synergies Tom laid out, we have set a goal to deliver $1 billion of EBITDA . . ."; and

- [**CERYANEC**]: "By the end of fiscal 2020, we expect our leverage to be under 2x as we hit the $1 billion of EBITDA and expect our debt to be under $2 billion by the end of 2020."

242. On December 21, 2018, Meredith continued to make false and misleading statements with respect to the $1 billion in EBITDA it claimed it would achieve following the Time acquisition and the synergies the deal would create. First, in a press release announcing the finalization of the sale of *Fortune* magazine to Chatchaval Jiaravanon, Meredith said again:

> Meredith is targeting a net debt-to-EBITDA ratio of 2.0x to 1 or better by the end of its fiscal 2020. This includes generating $1 billion of EBITDA and having net debt below $2 billion by the end of fiscal 2020."

243. On January 8, 2019, Defendant Ceryanec made a presentation at the Citi Global TMT West Conference in Las Vegas, NV. In addition to Ceryanec, Patrick McCreery[33] also spoke during the Company's presentation. During this presentation, Ceryanec and McCreery said:

- [**CERYANEC**]: "And then we've announced very publicly that we expect to drive $550 million in synergies through the combination of the 2 companies. And that's -- about 40% of that $550 million will come from headcount reductions and consolidation, with the remainder really coming through third parties, through vendors, through real estate contracts, through shuttering certain facilities, et cetera";

- [**CERYANEC**]: "We started, as we closed the Time acquisition, at $3.2 billion. We've said our goal this fiscal year is to have $1 billion of debt reduced. And then by the end of 2020, under $2 billion of debt with an EBITDA makeup of around $1 billion is our goal while continuing to grow our dividend and focus on our total shareholder return program . . . So the next page really outlines kind of the internal battle cry, if you will. $1 billion of debt reduction in fiscal '19 and $1 billion of EBITDA in fiscal 2020, which gets us to the leverage of under 2x by the end of our fiscal 2020";

[33] Patrick McCreery is President of the Local Media Group at Meredith, the business unit which runs Meredith's local television stations.

- [**CERYANEC**]: "First of all, that $1 billion in 2020 is 18-ish months out there. And so for us to sit here and continue to modify that outlook 18 months out, I want to be pretty darn sure that I'm going to beat that number. And I can't sit here today in today's economic environment, with all of the variables that come into a long-term model and the various revenue streams, and sit here and say, well, I'm going to -- because I've got $50 million more of synergies that I believe I can achieve, I'm going to modify my long-term model. So part of it is just, arguably, we've taken some risk out of hitting that $1 billion, but I'm not ready to modify that long-term outlook"; and

- [**McCREERY**]: "You've got millions of -- tens of millions of transactions worth of tens of millions of individual consumers at $12 a pop for a monthly or an annual subscription. So I can't sit here and say, would I come off $1 billion [EBITDA]. But I can say, we feel a lot better against being -- better being hedged against the downturn than we would have 2008. And we obviously survived that pretty well."

244. On February 11, 2019, in connection with the release of Meredith's fiscal second quarter 2019 earnings report, Meredith filed with the SEC a press release on a Form 8-K, signed by Ceryanec. In it, Defendants stated:

> Delivering at least $550 million of annualized cost synergies within the first two full years of combined operations. The Company has identified these synergies and is on track with its plan.

245. During Meredith's conference call in connection with its February 11, 2019 press release and Meredith's fiscal 2019 second quarter earnings, Defendants claimed:

- [**HARTY**]: "Finally, we've identified at least $550 million of annual cost synergies we expect to realize by the end of our first two years of combined operations, and we began the work to harvest those savings";

- [**CERYANEC**]: "[Corporate expense reductions are] synergies coming in . . . a lot of the what I call shared service functions, IT, accounting, finance run through there and that's a good chunk of it. And I think for the next 2 quarters, we'll probably see similar to maybe slightly reduced corporate expenses"; and

- [**HARTY**]: "$1 billion is the stated goal of ours . . . [O]ur stated goal of $1 billion of EBITDA will be in sight in the next 18 to 24 months, if not sooner. And we're always balancing short-term goals against longer-term targets of growing our business and investing for sustainable growth."

Meredith filed the February 11, 2019 investor conference call transcript on a Form 8-K, signed by Ceryanec, with the SEC on February 11, 2019.

246. On March 11, 2019, Defendants Harty and Ceryanec made a presentation at the Deutsche Bank Media and Telecom Conference in Palm Beach, FL. During this presentation, Defendants Harty and Ceryanec said:

- [**HARTY**]: "It's just been over 1 year from our acquisition of Time Inc. The addition of Time Inc. brands are a positive catalyst for growth and we are seeing improving trends. We also have a number of new growth opportunities, including those from our enhanced consumer reach. <u>Our integration work is yielding greater synergies than we first expected</u>";

- [**HARTY**]: "Looking forward, we are focused on successfully integrating the Time Inc. acquisition by . . . <u>fully realizing $550 million of annual cost synergies</u> in the first 2 full years of operation";

- [**CERYANEC**]: "Looking further ahead, <u>we continue to maintain our goal of delivering $1 billion of adjusted EBITDA in 2020</u>…"; and

- [**HARTY**]: "So the synergy opportunity that we see and I'd like to say that the magazine circulation is been rock solid . . ."

Meredith filed the slides from the presentation on March 11, 2019 at the Deutsche Bank conference on a Form 8-K, signed by Ceryanec, with the SEC on March 12, 2019. The slide deck further claimed that "<u>[s]ynergy work is exceeding expectations</u>."

247. On May 10, 2019, in the press release accompanying Meredith's May 10, 2019 fiscal third quarter 2019 earnings report, Defendants stated:

- "We remain focused on successfully integrating our acquisition of Time and have <u>already delivered on a majority of the stated synergies</u>";

- [**HARTY**]: "[W]e believe it will take longer than originally anticipated to achieve the remainder of the synergies due to investment spending to grow the business; retaining certain employees longer than anticipated to ensure business continuity; and operating the Assets Held for Sale longer than expected. However <u>we remain confident we will achieve our $550 million cost synergy goal by the end of fiscal 2020</u>";

- "Delivering at least $550 million of annualized cost synergies by the end of fiscal 2020"; and

- "In addition, Meredith continues to expect to deliver $550 million of net annual cost synergies by the end of fiscal 2020 as a result of the Time Inc. acquisition."

Meredith filed the May 10, 2019 press release on a Form 8-K, signed by Ceryanec, with the SEC on May 10, 2019.

248. During the conference call in connection with the May 10, 2019 press release and Meredith's fiscal 2019 third quarter earnings, Defendants claimed:

- [**HARTY**]: "We have spent the last year focused on our integration plan, and synergies are a key part of that plan. We will deliver $550 million of cost savings from our integration work, though we are adjusting the timing of when we expect to capture those savings";

- [**CERYANEC**]: "We expect fiscal 2019 adjusted EBITDA to range from $700 million to $710 million compared to our original range of $720 million to $750 million";

- [**CERYANEC**]: "Looking at expenses, we continue to expect to deliver $550 million of net annual cost synergies as a result of integrating the Time Inc. acquisition"; and

- [**CERYANEC**]: "[T]here's about $20 million that we would say -- would push from 2019 into 2020. I broadly put those in a couple categories. One, the asset sales obviously have taken us longer than we originally anticipated, so there's some stranded costs. Things like facilities and keeping people around to service those brands that we would have thought would have left the organization by now. So that, again, is a timing difference. As we're integrating all of the back-office functions to make sure we do it right, we've held some people longer than we anticipated or initially with those more in the IT, accounting and finance areas to make sure we support the business. So those are really the costs. We feel like it is a timing difference on realizing those synergies. And so those will push into 2020. As we said, we're committed to the $550 million in total."

Meredith filed the May 10, 2019 investor conference call transcript on a Form 8-K, signed by Ceryanec, with the SEC on May 10, 2019.

249. On June 10, 2019, in the press release announcing the departure of Defendant Werther from the Company, Defendants said:

> Additionally, we've . . . made excellent progress on synergy achievement and debt reduction.

Meredith filed the June 10, 2019 press release announcing Defendant Werther's departure from the Company on a Form 8-K, signed by Ceryanec, with the SEC on June 10, 2019.

250. As of the date of the acquisition and start of the Class Period on January 31, 2018, Defendants' statements referenced in ¶¶222–49 were materially false and misleading when made. Contrary to Defendants' statements at that time, Meredith lacked an adequate plan to integrate Time's finance and IT functions with Meredith's and realize the claimed synergies from the Time acquisition. Meredith also understood, or recklessly disregarded, by the time of the acquisition, the amount of low-margin subscriptions in the legacy Time brands and the significant costs to reduce or eliminate Meredith's reliance on those subscriptions.

251. Meredith's claimed synergies and projected $1 billion in EBITDA also lacked a reasonable basis because, hidden from investors: (i) Meredith had material weaknesses in its internal controls over financial reporting to value the Time assets; (ii) Meredith lacked sufficient internal audit personnel to integrate Time's much-larger operations; (iii) Meredith's integration of Time was failing; (iv) Meredith was unable to integrate the Time platform into Meredith's Enterprise Resource Planning system; (v) because of that, a few months after the acquisition, Meredith decided to maintain parallel systems at Meredith and Time for IT and finance functions and did not integrate them until August 2019; (vi) legacy Time employees would need to remain on Meredith's payroll longer than anticipated in order to maintain the proper functioning of those systems; (vii) Defendants knew, or were at a minimum reckless in not knowing, the number of low-margin subscriptions at legacy Time brands throughout the Class Period, changing very little

over that time, and that remedying them would require significant additional investment; and (viii) Meredith would not achieve its claimed synergies on its original timeline, it would not achieve its claimed $1 billion in EBITDA in fiscal year 2020, and it needed to incur tens of millions of dollar in additional expenses due to "investment spending to grow the business" and "retaining certain [Time finance and IT] employees longer than anticipated to ensure business continuity." Defendants' failures to disclose the foregoing material facts also rendered their statements materially false and misleading by omission when made.

## VIII. LOSS CAUSATION

252. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

253. During the Class Period, Lead Plaintiff and the Class purchased or otherwise acquired Meredith common shares at artificially inflated prices and were damaged thereby when the price of Meredith common stock declined when the truth was revealed through partial disclosures during the Class Period. Throughout the Class Period, the price of Meredith common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions. The price of Meredith common stock significantly declined (causing investors to suffer losses) when Defendants' materially false and misleading statements, alleged herein to have been concealed from the market, and/or the effects thereof, were revealed.

254. Specifically, Defendants' materially false and misleading statements misrepresented the inadequacy of the Company's internal controls over financial reporting, the scope of low-margin subscriptions at time, the difficulties Meredith had in integrating Time into its business, Meredith's own shortcomings in its audit, finance and IT functions to merge with Time, and the significant undisclosed costs Meredith needed to incur to rectify these problems. When those misrepresentations and misstatements were corrected, investors suffered losses as the

price of Meredith common stock declined. As a result of the disclosure of the truth of Defendants' fraud, Meredith common shares declined from a Class Period high of approximately $69.35 per share on January 31, 2018, to a Class Period low of approximately $31.43 per share on September 5, 2019, a decline of nearly 55%, and also on additional corrective disclosure dates of May 10, 2019 and October 1, 2019.

255. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the existing artificial inflation of Meredith common stock. It was also entirely foreseeable to Defendants that the revelation of the truth would cause the price of the Company's stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements.

## IX. APPLICATION OF PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

256. At all relevant times, the market for Meredith common stock was efficient for the following reasons, among others:

a) Meredith's stock met the requirements for listing, and was listed and actively traded under the ticker symbol "MDP" on the New York Stock Exchange, a highly efficient market, with an average daily trading volume of approximately 492,000 shares;

b) As a regulated issuer, Meredith filed periodic reports with the SEC;

c) Meredith regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Meredith was covered by at least six analysts employed by major brokerage firms, including, but not limited to, Citigroup, Wolfe Research, Wells Fargo, and Guggenheim Partners, who wrote reports that were distributed to those brokerage

firms' sales forces and certain customers. Each of these reports was publicly available and entered the public marketplace.

257. As a result of the foregoing, the market for Meredith stock promptly digested current information regarding Meredith from all publicly-available sources and reflected such information in Meredith's stock price. Under these circumstances, all purchasers of Meredith common stock during the Class Period suffered similar injury through their purchase of Meredith common stock at artificially inflated prices, and a presumption of reliance applies.

258. In addition, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

259. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Amended Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Meredith who knew that those statements were false or misleading when made.

## XI. CLASS ACTION ALLEGATIONS

260. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Meredith during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

261. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Meredith common stock was actively traded on the New York Stock Exchange. As of October 1, 2019, Meredith had over 45 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Class members who purchased Meredith common stock may be identified from records maintained by Meredith or its transfer agent(s), and may be notified of this class action using form of notice similar to that customarily used in securities class actions.

262. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

263. Lead Plaintiff will fairly and adequately protect the Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

264. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Meredith;

c) whether Defendants acted with scienter; and

d) to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

265. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

266. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

267. This Count is asserted on behalf of all members of the Class against Defendant Meredith and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

268. During the Class Period, Defendant Meredith and the Executive Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269. Defendant Meredith and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Company securities during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, Meredith's misrepresentations and failure to disclose Meredith's material weaknesses in its internal controls, the scope of low-margin subscriptions at Time, the difficulties Meredith had in integrating Time into its business, Meredith's own shortcomings in its audit, finance and IT functions to merge with Time, and the significant undisclosed costs Meredith needed to incur to rectify these problems.

270. Defendant Meredith and the Executive Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Meredith common shares, which were intended to, and did: (a) deceive the

investing public, including Lead Plaintiff and the Class, regarding the subject matters identified in the preceding paragraph; (b) artificially inflate and maintain the market price of Meredith common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Meredith common stock at artificially inflated prices and suffer losses when the true facts became known.

271. As described above, Defendant Meredith and the Executive Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

272. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Meredith common stock, which artificial inflation was removed from the stock when the true facts became known. Lead Plaintiff and the Class would not have transacted in Meredith common stock at the prices they paid, or at all, if they had been aware that the market price of Meredith common stock had been artificially inflated by Defendant Meredith and the Executive Defendants' false and misleading statements.

273. As a direct and proximate result of Defendant Meredith and the Executive Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Meredith common stock during the Class Period.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE EXECUTIVE DEFENDANTS)

274. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

275. This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

276. During their tenures as officers and/or directors of Meredith, each of the Executive Defendants acted as a controlling person of the Company with the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Meredith, the Executive Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

277. As more fully described above, in their capacities as senior corporate officers of the Company, the Executive Defendants had direct involvement in the day-to-day operations of the Company, including their power to control or influence the policies and practices giving rise to Meredith's misleading statements about Meredith's failure to disclose the financial and operational problems Meredith acquired from Time and Meredith's inability to rectify those problems quickly, and exercised the same. The Executive Defendants made numerous false and misleading statements on Meredith's behalf at investor conferences, in SEC filings, and on earnings calls.

278. Defendants Harty and Ceryanec signed the Company's SEC filings during the Class Period. The Executive Defendants were directly involved in disseminating Meredith's false and misleading statements during the Class Period. As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Meredith within the meaning of Section 20(a) of the Exchange Act.

279. Meredith violated Section 10(b) of the Exchange Act by its acts and omissions, as alleged in this Amended Complaint. By virtue of their positions as controlling persons of Meredith, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act,

jointly and severally to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Meredith common stock.

280. As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Meredith common stock.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: March 9, 2020

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ *John C. Browne*
John C. Browne (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
James M. Fee (admitted *pro hac vice*)
Alexander T. Payne (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
adam@blbglaw.com
james.fee@blbglaw.com
alex.payne@blbglaw.com

*Counsel for Lead Plaintiff the City of Plantation Police Officers Pension Fund and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner (*pro hac vice* forthcoming)
Stuart A. Kaufman (*pro hac vice* forthcoming)
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff the City of Plantation Police Officers Pension Fund*

**DICKINSON, MACKAMAN, TYLER**
**& HAGEN, P.C.**
Mollie Pawlosky, AT0006198
John E. Lande, AT0010976
699 Walnut Street, Suite 1600
Des Moines, IA 50309-3986
Telephone: (515) 244-2600
Facsimile: (515) 246-4550
mpawlosky@dickinsonlaw.com
jlande@dickinsonlaw.com

*Local Counsel for Lead Plaintiff the City of Plantation Police Officers Pension Fund*